# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VENEZUELA US SRL,<br><br>                      Petitioner,<br><br>    v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>                      Respondent. | Case No. 22-cv-3822-JMC |

## ORDER

For the reasons stated in the accompanying memorandum opinion, it is hereby **ORDERED** that Venezuela US SRL's ("VUS") Petition to Enforce Arbitration, ECF 1, is **GRANTED**.

It is further **ORDERED** that VUS shall file a proposed order of judgment by **June 23, 2025**, reflecting the exact monetary amount sought, including interest, consistent with the arbitration award and the Court's memorandum opinion. The Bolivarian Republic of Venezuela ("Venezuela") may respond to VUS's proposed order by **July 7, 2025**, and VUS's reply, if any, is due by **July 14, 2025**.

It is further **ORDERED** that Venezuela will bear the costs of this proceeding; that VUS shall submit a motion with supporting documentation establishing its costs for this proceeding by **June 30, 2025**; and that Venezuela shall respond to VUS's cost submission by **July 14, 2025**.

**SO ORDERED.**

_____
JIA M. COBB
United States District Judge

Date: June 9, 2025

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| VENEZUELA US SRL,<br><br>　　　　　　Petitioner,<br><br>　v.<br><br>BOLIVARIAN REPUBLIC OF VENEZUELA,<br><br>　　　　　　Respondent. | Case No. 22-cv-3822-JMC |

**MEMORANDUM OPINION**

Petitioner Venezuela US SRL ("VUS") brings this action against Respondent Bolivarian Republic of Venezuela ("Venezuela"). VUS petitions for recognition and enforcement of a foreign arbitral award against Venezuela (the "Final Award") under the New York Convention. Venezuela counters that recognition and enforcement of the Final Award would violate public policy by contravening the President's recognition of the government of former Interim President of Venezuela Juan Guaidó (the "Interim Government") as the sole recognized government of Venezuela. Yet the weight of the caselaw instructs that recognizing and enforcing an arbitration award against Venezuela would do no such thing. Accordingly, the Court will **GRANT** VUS's petition.[1]

**I.　　BACKGROUND**

The following facts are undisputed.

---

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

1

A. **The Underlying Arbitral Proceedings**

1. <u>The Jurisdiction and Liability Phases</u>

VUS, a Barbadian registered company, has interests in a Venezuelan oil field. ECF 1 ¶ 2. After VUS did not receive certain dividends from that oil field, the company entered arbitration against Venezuela in March 2013. *Id.* VUS argued that Venezuela had violated the Agreement Between the Government of Barbados and the Government of the Republic of Venezuela for the Promotion and Protection of Investments by depriving VUS of dividends. *Id.* The arbitration took place before the Permanent Court of Arbitration (PCA) in The Hague, Netherlands, under the Arbitration Rules of the United Nations Commission on International Trade Law. ECF 1-1 ¶ 2. Venezuela was represented by the government of Nicolas Maduro and the law firm Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis"). ECF 20-1 ¶¶ 1, 3, 11; ECF 22-1 ¶ 9.

In the first phase of the arbitration, the Parties submitted their statements of claim and defense, then the tribunal dealt with Venezuela's initial jurisdictional objection. ECF 1-1 ¶ 8; ECF 20-1 ¶ 4. Following briefing and a July 2014 hearing before the PCA, the tribunal dismissed Venezuela's objection in an interim award on July 26, 2016. ECF 1-1 ¶ 8; ECF 20-1 ¶ 4. Next, the parties conducted merits briefing, which continued until February 2018. ECF 1-1 ¶ 9; ECF 20-1 ¶ 5. The tribunal then began deliberating on Venezuela's remaining jurisdictional objections and liability. ECF 20-1 ¶ 5.

2. <u>United States Recognition of Interim Government</u>

While the tribunal was deliberating, Maduro claimed victory in a highly disputed election in May 2018. ECF 20-1 ¶ 6. In response, on January 23, 2019, the National Assembly of Venezuela declared its president, Juan Guaidó, the Interim President of the Republic pursuant to Article 233 of the Venezuelan Constitution. *Id.* ¶ 7. That same day, U.S. President Donald Trump recognized

2

the Interim Government as the legitimate government of Venezuela and derecognized the Maduro regime. *Id.* The United States has considered the Interim Government to be the legitimate government of Venezuela ever since and "has given no indication that it will change its longstanding position that the Maduro government is illegitimate." *Id.* ¶ 12; *PDVSA US Litig. Tr. v. LukOil Pan Americas LLC*, 65 F.4th 556, 561 (11th Cir.), *cert. denied*, 144 S. Ct. 343 (2023). Curtis continued to represent Venezuela—apparently at the instruction of the Interim Government—in the arbitration until June 30, 2020, at which point, according to the tribunal, representation of the Republic switched to a new law firm that purported to represent the Maduro regime. ECF 20-1 ¶¶ 9, 12.[2]

### 3. The Damages Phase

On February 5, 2021, the tribunal issued a Partial Award on Jurisdiction and Liability, which found Venezuela liable for non-payment of dividends to VUS in 2008 and 2009. ECF 1-1 ¶ 9. The Interim Government and its lawyers learned from the Partial Award that the Maduro regime had appointed new counsel for Venezuela in the arbitration proceedings. ECF 20-1 ¶ 9–10. The Interim Government and Curtis made no further attempts to participate in the arbitration proceedings after that point. *Id.* ¶¶ 10–11; ECF 22-1 ¶¶ 10–11. In February 2022, the tribunal received additional briefing and held a hearing on issues of causation, damages, and interest. ECF 1 ¶ 17. On November 4, 2022, the tribunal issued its Final Award to VUS of $58,870,898 for unpaid dividends plus interest. *Id.* ¶¶ 17, 35 As part of that Final Award, the tribunal also granted VUS almost $4 million plus interest in arbitration costs and legal fees. *Id* ¶ 18; ECF 1-2 ¶ 107.

---

[2] It is unclear from the record exactly when Curtis began taking instructions from the Interim Government rather than the Maduro regime. Venezuela's declaration suggests that this happened at some point after the disputed election of 2018 and before the attorney switch of June 2020. *See* ECF 20-1 ¶¶ 8–12.

3

B. **Procedural Background**

VUS filed the instant petition seeking an order recognizing and enforcing the Final Award. ECF 1. VUS completed service on the Interim Government on October 11, 2023. ECF 16. Venezuela filed its Opposition on December 11, 2023, ECF 20, and VUS submitted its Reply on January 5, 2024, ECF 22.

## II. LEGAL STANDARD

This matter comes before the Court on review of an arbitral award pursuant to 9 U.S.C. § 207 and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention" or "Convention"). The New York Convention was implemented in the United States by amendment of the Federal Arbitration Act ("FAA"). *See* Act of July 31, 1970, Pub. L. 91–368, 84 Stat. 692 (codified at 9 U.S.C. §§ 201–08). "Consistent with the 'emphatic federal policy in favor of arbitral dispute resolution' recognized by the Supreme Court . . . the FAA affords the district court little discretion in refusing or deferring enforcement of foreign arbitral awards." *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). Indeed, a court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the . . . Convention." 9 U.S.C. § 207. The burden of escaping award confirmation "is high" and "rests with the party resisting confirmation." *Int'l Trading & Indus. Inv. Co. v. DynCorp Aerospace Tech.*, 763 F. Supp. 2d 12, 20 (D.D.C. 2011).

## III. ANALYSIS

The Court begins by addressing its jurisdiction. It then assesses Venezuela's argument that recognizing and enforcing the Final Award would infringe the Executive Branch's exclusive

4

authority to recognize foreign governments and thereby violate U.S. public policy—one of the enumerated grounds for refusal of recognition or enforcement under the New York Convention. *See* New York Convention, art. V(2)(b). On that question, the Court first concludes that Venezuela has not waived its public policy defense. Even so, the Court finds that Venezuela fails to meet its burden to show that the Executive's recognition power meets the high bar to qualify as a public policy under the New York Convention. Finally, even if the President's recognition of a foreign government were a qualifying public policy in the way Venezuela insists it is, granting VUS's petition would not impair or contravene that recognition.

### A. Jurisdiction

Under the Foreign Sovereign Immunities Act ("FSIA"), "a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993) (citing *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488–89 (1983)). One of the FSIA's specified exceptions provides subject matter jurisdiction for actions to confirm certain arbitration awards. *See* 28 U.S.C. § 1605(a)(6). "[T]he New York Convention 'is exactly the sort of treaty Congress intended to include in the arbitration exception.'" *Creighton Ltd. v. Gov't of State of Qatar*, 181 F.3d 118, 123–24 (D.C. Cir. 1999) (quoting *Cargill Int'l S.A. v. M/T Pavel Dybenko*, 991 F.2d 1012, 1018 (2d Cir.1993)). VUS invokes the arbitration exception as one of the grounds for the Court's jurisdiction, ECF 1 ¶ 8, and Venezuela does not object, *see generally* ECF 20.

VUS claims personal jurisdiction under 28 U.S.C. § 1330(b), and Venezuela does not contest personal jurisdiction, either. *See* ECF 1 ¶ 10; ECF 20. The Court is therefore satisfied that it possesses both subject matter and personal jurisdiction over the parties.

5

### B. Public Policy Exception

To get out from under the Final Award, Venezuela looks to the New York Convention's public policy exception. That provision permits a court to decline enforcement of a foreign arbitral award when it finds that "[t]he recognition or enforcement of the award would be contrary to the public policy" of the United States. New York Convention, art. V(2)(b). However, "[t]he public policy defense under Article V(2)(b) of the New York Convention is to be construed narrowly and is available only where an arbitration award 'tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property.'" *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016) (quoting *TermoRio S.A. E..S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007)). Put another way, the public policy exception applies "only where enforcement would violate the forum state's most basic notions of morality and justice." *TermoRio S.A. E.S.P*, 487 F.3d at 938. This "heavy burden" reflects the "countervailing and 'emphatic federal policy in favor of arbitral dispute resolution'" underlying the New York Convention. *Enron Nigeria Power Holding, Ltd.*, 844 F.3d at 289 (quoting *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

Venezuela argues that recognizing and enforcing the Final Award would violate U.S. public policy—namely, the Constitution's entrusting of the Executive Branch with the exclusive authority to recognize foreign governments. ECF 20 at 6. According to Venezuela, recognizing and enforcing the Final Award would be tantamount to "recogniz[ing]" the Maduro regime, rather than the Interim Government, "as acting for the Republic [of Venezuela]" in contravention of the President's 2019 decision to recognize the Interim Government as the sole legitimate government of Venezuela, because the Maduro regime represented Venezuela in part of the underlying

6

arbitration. *Id.* at 7. VUS disputes that argument on three fronts: that Venezuela waived this defense; that the President's recognition power is not a relevant public policy under the New York Convention; and that, even if it were, recognizing and enforcing the Final Award would not constitute a recognition of the Maduro regime. The Court takes each in turn.

i. <u>Waiver</u>

VUS contends that Venezuela waived its public policy defense by failing to object to the Maduro regime's representation of Venezuela in the later phases of the arbitration. ECF 22 at 21. Venezuela insists that, as a rule, public policy defenses under the New York Convention cannot be waived, citing the D.C. Circuit's decision in *Enron*, 844 F.3d at 287–88. Yet, as VUS correctly observes, that is not what *Enron* held. Instead, *Enron* held only that a party to a New York Convention arbitration could not contractually waive a public policy defense *ex ante*, before any arbitration, as doing so would impermissibly "elevat[e] the parties' contractual choices above the fundamental need of the federal courts to protect their own integrity" by independently enforcing the New York Convention's public policy defense. *Enron*, 844 F.3d at 288. The proper rule, according to VUS, holds that parties may waive their public policy defense under the New York Convention by "fail[ing] to raise its objection in a timely manner while the arbitration was ongoing . . . despite having full knowledge of the facts" that presented the public policy issue. ECF 22 at 22 (citing *Técnicas Reunidas de Talara S.A.C. v. SSK Ingeniería y Construcción S.A.C.*, 40 F.4th 1339, 1346 (11th Cir. 2022)).

Although the D.C. Circuit has not adopted the *Técnicas* rule, this Court finds it persuasive and adopts it for present purposes. Nonetheless, Venezuela does not appear to have waived its defense even under that rule. The record demonstrates that Venezuela knew by February 2021 that the Maduro regime had taken over representing Venezuela in the arbitration, which was 21 months

7

before the tribunal issued the Final Award and a year before the tribunal held a hearing on the "damages phase" of the proceeding. ECF 22 at 24; ECF 20-1 ¶ 10; ECF 1 ¶ 17. That shows Venezuela's knowledge of *one* of the critical facts underlying their public policy objection. But the record does not evince Venezuela's knowledge, before the arbitration concluded, of another critical fact: that VUS would seek to enforce the arbitration award in the United States—or, at minimum, in a country that recognized the Interim Government instead of the Maduro regime. The Court takes judicial notice of the fact that countries around the world varied in their responses to the disputed Venezuelan election that led President Trump to recognize the Interim Government instead of the Maduro regime. Specifically, some countries—including signatories to the New York Convention—did not consistently recognize Guaidó as the interim president.[3] And the public policy exception applies the public policy of the "forum [s]tate" in which the petitioner seeks recognition and enforcement. New York Convention, art. V(2)(b). Thus, the record lacks evidence that Venezuela (i.e., the Interim Government) knew that enforcement of the Final Award would raise a public policy issue—or, indeed, that the Maduro regime's presence constituted a legal error in the arbitration proceedings at all. *See Técnicas*, 40 F.4th at 1346 (explaining that waiver applies when the party invoking the public policy exception "fail[ed] to object to [an] underlying legal error").[4]

---

[3] *See, e.g.*, Cassandra Garrison & Walter Bianchi, *Argentina Revokes Credentials of Representative for Venezuela's Guaido* (Jan. 7, 2020), https://perma.cc/V6L8-DAFJ (reporting that Argentina stopped recognizing Guaidó as the president of Venezuela); *see also* New York Convention, *Contracting States*, https://perma.cc/M2ZP-7FZF (listing Argentina as a signatory and Contracting State of the New York Convention); *Hourani v. Psybersolutions LLC*, 164 F. Supp. 3d 128, 136 (D.D.C. 2016), *aff'd*, 690 F. App'x 1 (D.C. Cir. 2017) ("A court . . . may take judicial notice of historical, political, or statistical facts, or any other facts that are verifiable with certainty."); *accord* Wright & Miller, 9A Fed. Prac. & Proc. Civ. § 2409 (3d ed.).

[4] Venezuela does suggest that the tribunal's failure to notify the Interim Government's attorneys that a new law firm representing the Maduro regime had begun representing Venezuela in the proceedings was erroneous, or at least abnormal. ECF 20 at 10; ECF 20-1 ¶¶ 10–11. But nowhere do either Venezuela or VUS state that the tribunal's decision to allow that new law firm to represent Venezuela (as distinct from its failure to notify) constituted a procedural or other legal error in the arbitration. Indeed, had VUS sought to enforce the Final Award in a different New York Convention signatory country that recognizes the Maduro regime instead of the Interim Government, such

Accordingly, the Court does not find that Venezuela waived its public policy defense, and it proceeds to the merits of that defense.

ii. <u>Recognition Power as Public Policy</u>

The party invoking the New York Convention's public policy exception must first "identify a well-defined public policy." *Enron*, 844 F.3d at 287. That "public policy must be 'explicit' and 'well-defined and dominant, and [it] is to be ascertained by reference to the laws and legal precedents.'" *Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Ga*s, 314 F. Supp. 3d 95, 109 (D.D.C. 2018) (quoting *United Paperworkers v. Misco, Inc.*, 484 U.S. 29, 43 (1987)). The public policy exception "was not meant to enshrine the vagaries of international politics under the rubric of 'public policy.'" *Id.* (quoting *Parsons & Whittemore Overseas Co. v. Societe Generale De L'Industrie Du Papier (RAKTA)*, 508 F.2d 969, 974 (2d Cir. 1974)).

Venezuela identifies "the Executive's 'exclusive prerogative' to recognize the only effective government of a foreign state" as the applicable public policy. ECF 20 at 13 (citing *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 19 (2015)). The Executive's recognition power is a long-affirmed component of the Constitution's separation of powers. *See Guar. Tr. Co. of New York v. United States*, 304 U.S. 126, 138 (1938) (holding that the political department's "action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts"). Yet, the question of whether the Executive's recognition power can support a public policy defense under the New York Convention appears to be a question of first impression. Venezuela does not cite a case establishing the recognition power as a relevant public

---

as Argentina, the Maduro regime's representation of Venezuela in the arbitration would have affirmed the forum state's (Argentina's) public policy, not countermanded it. In that scenario, it would be even less plausible that the Maduro regime's substitution in the arbitration was erroneous. Accordingly, the Court cannot find that Venezuela's public policy objection here is the kind that it needed to raise first in the arbitration.

policy under the New York Convention. *See* ECF 20 at 13–16. Instead, Venezuela points to other sources of law to piece together the public policy. Venezuela turns first to the Supreme Court's recognition power case law, principally *Zivotofsky*, 576 U.S. at 19, *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 410 (1964), and *Guaranty Trust*, 304 U.S. at 137–38. *See* ECF 20 at 13. From those cases and the Constitution, Venezuela posits that "[t]he recognition doctrine and related separation-of-powers principles are precisely the sort of public policy that [New York Convention] Article V(2)(b) was designed to protect." ECF 20 at 13.

VUS disagrees. VUS acknowledges the constitutional nature of the recognition power but insists that infringing upon it would not "violate the [United States'] most basic notions of morality and justice." ECF 22 at 16 (quoting *Tatneft v. Ukraine*, 21 F.4th 829, 837 (D.C. Cir. 2021)). If the recognition power qualifies for the public policy defense, VUS argues, then "every arbitration award . . . would have to be reviewed for compliance with U.S. law." ECF 22 at 17. In VUS's view, that would "eviscerate" the "streamlined enforcement mechanism for arbitral awards" established by the New York Convention. *Id.* VUS concludes that Venezuela has not met its "'substantial' burden" to establish a public policy defense. ECF 22 at 19 (citing *BCB Holdings Ltd. v. Gov't of Belize*, 110 F. Supp. 3d 233, 250 (D.D.C. 2015)).

As an initial matter, Venezuela is correct that the President's recognition power "is rooted in the Constitution as repeatedly affirmed by the Supreme Court." ECF 20 at 13. And the President's "action in recognizing a foreign government and in receiving its diplomatic representatives is conclusive on all domestic courts, which are bound to accept that determination." *Guaranty Trust*, 304 U.S. at 138. Thus, for instance, U.S. courts may not permit unrecognized governments "to sue in the courts of the United States." *Banco Nacional*, 376 U.S. at 409–10. Accordingly, Venezuela makes a facially plausible case that enforcement of the Final Award

10

would run "'distinctly contrary to the *basic principles of the [U.S.] legal system*'" and thereby fall within the public policy exception's ambit. ECF 20 at 14 (quoting U.N. Econ. & Soc. Council, Report of the Comm. on the Enforcement of International Arbitral Awards § 49, U.N. Doc. E/2704 and Corr. 1, E/AC.42/rev.1 (1955)).

On the other hand, the public policy defense "is to be construed narrowly." *Enron Nigeria*, 844 F.3d at 289. It is "'frequently raised'" but "'rarely . . . successful.'" *Chevron Corp. v. Republic of Ecuador*, 949 F. Supp. 2d 57, 69 (D.D.C.), *judgment entered*, 987 F. Supp. 2d 82 (D.D.C. 2013), and *aff'd sub nom. Chevron Corp. v. Ecuador*, 795 F.3d 200 (D.C. Cir. 2015) (quoting *Republic of Iran v. Cubic Defense Sys., Inc.,* 665 F.3d 1091, 1097 (9th Cir. 2011)). It applies "only where enforcement [of the arbitral award] would violate the forum state's most basic notions of morality and justice." *Tatneft v. Ukraine*, 21 F.4th 829, 837 (D.C. Cir. 2021) (quoting *TermoRio*, 487 F.3d at 938). That "standard is high" and is met "infrequently" and only "in clear-cut cases." *TermoRio*, 487 F.3d at 938. And the asserted public policy must overcome the "emphatic federal policy in favor of arbitral dispute resolution." *Id.*

Although the caselaw offers no clear answer either way, the Court finds VUS's position more persuasive. For one thing, Venezuela does not even attempt to justify its position under that governing "basic notions of morality and justice" standard. *Id*. As VUS argues, Venezuela's failure to cite that standard or apply it to the facts of this case undermines its argument, given that Venezuela bears the burden of establishing the public policy defense. ECF 22 at 18. In fact, the D.C. Circuit has previously rejected a New York Convention public policy defense based on the asserted public policy of "the separation of powers" when the respondent foreign state failed to show that enforcement would violate "any 'basic notion of morality and justice' rooted in . . . [that] doctrine[]." *BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016).

11

Moreover, Venezuela cites no case finding a public policy issue on facts similar to this case—or anything close. Indeed, Venezuela cites just one case upholding a public policy defense: *Hardy Expl. & Prod. (India), Inc.*, 314 F. Supp. 3d 95. But the public policy that supported the defense in *Hardy* looked little like the one asserted here. There, India (the foreign state respondent) sought to block enforcement of an arbitration award of specific performance that required India to cede to the petitioner private corporation a degree of control over "a geographic block off the southeastern coast of India" for "the extraction, development, and production of hydrocarbons." *Id.* at 100–01. In its defense, India invoked "the U.S.'s clear public policy preference of respecting the sovereignty of foreign nations, including their right to control their own lands and natural resources." *Id.* at 110. Judge Contreras on this court agreed with India, finding that policy "expressed through the Foreign Sovereign Immunities Act" and "other treaties regarding the liability of foreign nations." *Id.* at 111. Judge Contreras noted, for instance, that the FSIA's arbitration exception—on which the court's jurisdiction rested—excluded "any mention of specific performance or extraterritorial enforcement, apart from the terrorism and expropriation exceptions," thereby calling into question the court's jurisdiction to grant the requested relief at all. *Id.* at 114. Further, the court surveyed the caselaw and could not find an order with as "invasive" a remedy as the one sought in that case. *Id.* at 113. In those ways, that court ruled, the award would "violate the United States' most basic notions of morality and justice." *Id.* at 109.

*Hardy* is Venezuela's best (really, its only) case. Yet the Court struggles to see how it extends to the instant dispute. First, despite the recognition power's importance to our constitutional system, it implicates basic notions of morality and justice less obviously than the principle of respecting the sovereignty and territorial integrity of foreign states. Instead, the Supreme Court's recognition decisions have focused on the efficiency and political-accountability

12

benefits of the United States "speaking 'with one voice'" on the matter of recognizing foreign sovereigns, rather than invoking notions of morality or justice per se. *Zivotofsky*, 576 U.S. at 28 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 381 (2000)); *see also id.* at 17 ("If the President is to be effective in negotiations over a formal recognition determination, it must be evident to his counterparts abroad that he speaks for the Nation on that precise question."); *Banco Nacional*, 376 U.S. at 411–12 (discussing the "possible incongruity of judicial 'recognition' . . . of a government not recognized by the Executive" and the risk of "embarrassment to the Executive Branch in handling foreign relations" posed by such a scenario). Second, and perhaps even more compelling, the requested relief in *Hardy* potentially exceeded that court's jurisdiction under the FSIA. No such jurisdictional issue presents itself here.

All told, then, Venezuela has failed to meet its burden to establish a public policy defense on the basis of the President's recognition power.

iii.     Whether the Requested Order Would Violate That Policy

Even if the recognition power qualified as a relevant public policy under Article V(2)(b) of the New York Convention, Venezuela has also not met its burden to show that confirmation of the Final Award would violate that policy. Venezuela argues that an enforcement order from this Court would contravene the President's recognition of the Interim Government as the formal government of Venezuela. ECF 20 at 16. Venezuela reaches this conclusion based on three propositions. First, Venezuela correctly observes that the President's recognition of the Interim Government—not the Maduro regime—means that "only representatives of [the] Interim Government have standing to appear on behalf of the Republic in U.S. courts." ECF 20 at 17. Next, Venezuela notes that "[f]ormal recognition also precludes other co-equal branches of government from issuing any decrees that expressly or implicitly contradict the Executive's recognition of a

13

foreign government." *Id.* Finally, Venezuela concludes that "[s]ince the Maduro regime could not do in a domestic court what it purported to do in the underlying arbitration [i.e., appear as a party as the government of Venezuela], it necessarily follows that this Court cannot indirectly give effect to the Maduro regime's acts by converting the resulting award into a U.S. judgment." *Id.* In summary, Venezuela argues that "this Court may not enforce a foreign arbitral award rendered in proceedings in which only the Maduro regime purported to act on behalf of Venezuela, as if the award were binding on the Republic," because that would recognize the Maduro regime as the government of Venezuela. *Id.* at 18.

VUS responds that the D.C. Circuit already considered and rejected those arguments in *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela, Ministerio del Poder Popular para Relaciones Exteriores*, 87 F.4th 510, 513 (D.C. Cir. 2023). That decision affirmed the enforcement of an International Centre for Settlement of Investment Disputes (ICSID) arbitral award against Venezuela despite the fact that, as here, lawyers representing the Maduro regime rather than the Interim Government participated in the underlying arbitration. *See id.* at 513–14. Nonetheless, Venezuela insists that *Valores Mundiales* "does not dispose of this case" because, "[u]nlike the ICSCD Convention, the New York Convention expressly provides a public policy exception to enforcement of awards." ECF 20 at 12 n.4.

Venezuela's point is well-taken. Because of that distinction between the two arbitration regimes, the D.C. Circuit's holding may not strictly decide this case. In *Valores Mundiales*, the D.C. Circuit emphasized that its limited review authority under ICSID's enforcement regime allowed it to "express[] no opinion regarding the Annulment Committee's decision," including that committee's decision to let the Maduro regime represent Venezuela in the arbitration proceedings even after the United States recognized the Interim Government as the official

14

government of Venezuela. 87 F.4th at 522. It further noted that "[a]n ICSID Arbitral Tribunal and Annulment Committee are not bound by United States law." *Id.* The New York Convention, by contrast, does ask the enforcing court to apply certain principles of U.S. law—specifically, those so basic and fundamental to the country's sense of morality and justice as to constitute a public policy—when reviewing and deciding whether to enforce an arbitration tribunal's decision. For that reason, enforcement under the New York Convention presents a slightly more complicated question than the D.C. Circuit faced under the ICSID Convention in *Valores Mundiales*.

Nonetheless, other aspects of the D.C. Circuit's reasoning in that case persuade the Court of VUS's position. The Circuit there explained that the act of enforcing the arbitration award "in no way 'recognizes' anyone purporting to act on behalf of a sovereign state," because "[r]ecognition is a 'formal acknowledgement . . . that a particular regime is the effective government of a state.'" *Id.* at 521–22 (quoting, in part, *Zivotofsky*, 576 U.S. at 11). Enforcing an arbitration award takes no such form. Accordingly, the Circuit continued, "[n]othing in our enforcement of the ICSID awards forces the Executive to contradict his statements recognizing the Guaidó regime." *Id.* at 522. Further, the Circuit found no evidence "to indicate that [the ICSID Convention's implementing legislation] was passed with a purpose of undermining the Executive's foreign affairs authority" but instead merely "implement[ed] a treaty that the President signed and the Senate approved." *Id.* All of those considerations apply with equal force to awards under the New York Convention, including the one at issue in this case.

Consistent with that reasoning, VUS points out that "the *party* to the Arbitration," and thus the one bound by the Final Award, "was the Bolivarian Republic of Venezuela—the nation state—and not one government or the other." ECF 22 at 20 (emphasis in original). Generally speaking, "the legal position of a foreign state survives changes in its governments," and "the obligations of

15

a foreign state are unimpaired by a change in the state's government." *Republic of Iraq v. ABB AG*, 768 F.3d 145, 163–64 (2d Cir. 2014) (citing, e.g., *The Sapphire*, 78 U.S. (11 Wall.) 164, 168 (1871); *Comanche County v. Lewis*, 133 U.S. 198, 205 (1890)). In other words, the arbitration award runs against the foreign state, not any particular government thereof. And critically, the President's recognition decision in 2019 changed only the *government* of the Bolivarian Republic of Venezuela that the U.S. would recognize; it did not change the United States' recognition of Venezuela as a sovereign *state* over its territory. *See* ECF 20-3 at 2; *see also* Restatement (Third) of Foreign Relations Law § 203 cmt. a (1987) (distinguishing between recognition of a state and recognition of a government, i.e., the "particular regime that is the effective government of a state"). Thus, enforcing an award against the Republic of Venezuela, the same state that incurred the obligation under the award, is perfectly consistent with the Executive's previous and ongoing recognition of that Republic as a sovereign state. And because the Interim Government is the sole recognized government of Venezuela, according to the Executive, it must answer for the obligations of the Republic of Venezuela even though the Maduro regime incurred the original debt and represented the Republic in part of the arbitration. Under those principles, holding the Republic of Venezuela—represented in this Court by the Interim Government—to that state's obligations under the Final Award is *not* equivalent to letting the Maduro regime appear in this Court to represent Venezuela, the scenario that would implicate recognition.

Venezuela cites two other cases to support its argument, neither of which suffices. First, *Zivotofsky* is inapt because Congress's violation of the President's recognition power in that case was in direct contravention of the President's decision not to recognize Jerusalem as part of the State of Israel. 576 U.S. at 29–30. Here, as in *Valores Mundiales* but unlike in *Zivotofsky*, "[n]othing in [the Court's] enforcement of the [New York] Convention award[] forces the

16

Executive to contradict his statements recognizing" the Interim Government. *Valores Mundiales*, 87 F4th at 522 (citing *Zivotofsky*, 576 U.S. at 30). That is because "the Executive's exclusive [recognition] power extends no further than his formal recognition determination." *Zivotofsky*, 576 U.S. at 30. A coordinate branch "may not enact a law" or take another act "that directly contradicts it" and either "effects formal recognition" or "mandate[s] that the Executive contradict his prior recognition determination." *Id.* As explained above, enforcing the Final Award would do neither.

Last, Venezuela seeks to hang its hat on the Third Circuit's decision in *The Maret*, 145 F 2d 431 (3d Cir. 1944). In short, that case involved an Estonian ship that changed hands through a nationalization process by the newly instituted Soviet Republic of Estonia. *The Maret*, 145 F.2d at 433–39. As relevant here, the United States declined to recognize the Soviet Republic of Estonia, requiring the Third Circuit to evaluate the legal effect of actions or decrees of Estonia's ruling but unrecognized government. *Id.* at 439–42. That court concluded that "[w]hen the fact of nonrecognition of a foreign sovereign and nonrecognition of its decrees by our Executive is demonstrated as in the case at bar, the courts of this country may not examine the effect of decrees of the unrecognized foreign sovereign . . . ." *Id.* at 442.

But *The Maret* is hardly on all fours with the current facts. For one, the central act of the unrecognized sovereign in that case was a formal act or decree by the unrecognized government itself. *Id.* ("[T]he decrees of nationalization and transfer made by the Soviet Republic of Estonia may not be recognized."). By contrast, the Final Award in the instant case is an act or decree of *the third-party arbitrator*, not the Maduro regime. Next, the Third Circuit even admitted that views on the breadth of nonrecognition are not in harmony with each other. The views run the gamut from nonrecognition having little impact on the legal effect of knowable, observable actions of an

17

unrecognized sovereign, to the Third Circuit's holding in *The Maret* that courts cannot give legal effect whatsoever to the acts or decrees of unrecognized governments. *See id.* at 440–42. Further, *The Maret* preceded by decades the United States' entry into the New York Convention, and it involved neither international arbitration awards nor arbitration enforcement. Not to mention that the D.C. Circuit has never extended *The Maret*'s holding to any context closer to that of arbitration award enforcement under the New York Convention.[5] Thus, *The Maret* offers little, if any, support to Venezuela's argument here. Certainly, it does not suffice to overcome the force of the strong federal policy in favor of enforcing arbitration awards.

Thus, on multiple grounds, Venezuela's public policy defense comes up short. And without a cognizable defense under the New York Convention, Venezuela's bid to avoid recognition and enforcement of the Final Award fails.

\* \* \*

For the foregoing reasons, VUS's petition, ECF 1, is **GRANTED**. A separate order accompanies this memorandum opinion.

**SO ORDERED.**

JIA M. COBB
United States District Judge

Date: June 9, 2025

---

[5] Only one D.C. Circuit case has cited *The Maret* at all: *Latvian State Cargo & Passenger S.S. Line v. McGrath*, 188 F 2d 1000 (D.C. Cir. 1951). But the D.C. Circuit did so merely as part of a string cite supporting the proposition that "much has been written upon the general subject" of the effect of the United States' nonrecognition of the Soviet Socialist Republics. *Latvian State Cargo*, 188 F.2d at 1002. Further, because the holding of *Latvian State Cargo* largely mirrors that of *The Maret*, it has minimal applicability to the instant case for all the same reasons as *The Maret* does. *See id.* at 1003 ("We are of opinion that when the executive branch of the Government has determined upon a foreign policy, which can be and is ascertained, and the non-recognition of *specific foreign decrees* is deliberate and is shown to be part of that policy, such non-recognition must be given effect by the courts.") (emphasis added).

18