# United States Court of Appeals
# for the District of Columbia Circuit

VENEZUELA U.S. S.R.L.,

*Petitioner-Appellee,*

*v.*

BOLIVARIAN REPUBLIC OF VENEZUELA,

*Respondent-Appellant.*

_____

*On Appeal from the United States District Court for the District of Columbia
in Case No. 1:22-cv-03822-JMC, Jia M. Cobb, U.S. District Judge*

## BRIEF FOR RESPONDENT-APPELLANT

DAVID V. HOLMES
CURTIS, MALLET-PREVOST,
   COLT & MOSLE LLP
101 Park Avenue, 35th Floor
New York, New York 10178

JOSEPH D. PIZZURRO
JUAN O. PERLA
CURTIS, MALLET-PREVOST,
   COLT & MOSLE LLP
1717 Pennsylvania Avenue, NW
Washington, DC 20006
(202) 452-7373
jpizzurro@curtis.com
jperla@curtis.com

*Counsel for Respondent-Appellant*



# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

Pursuant to Circuit Rule 28, Respondent-Appellant Bolivarian Republic of Venezuela (the "Republic" or "Venezuela"), through counsel, states that:

1. **Parties and *Amici*.** The parties who appeared before the district court and who are before this Court are: the Republic and Petitioner-Appellee Venezuela U.S. S.R.L. (VUS). There were no *amici* or intervenors in the district court and none are before this Court now.

2. **Rulings under Review.** This appeal involves review of the June 9, 2025 Order of the United States District Court for the District of Columbia, the Honorable Jia M. Cobb, in *Venezuela U.S. S.R.L. v. Bolivarian Republic of Venezuela*, No. 1:22-cv-3822-JMC, Dkt. No. 38 (JA95), and the accompanying Memorandum Opinion, Dkt. No. 39 (JA96-113). The Order granted VUS' petition to recognize and enforce a foreign arbitral award under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38, as implemented by the Federal Arbitration Act (FAA), 9 U.S.C. § 201 *et seq*. The Memorandum Opinion is available at 789 F. Supp. 3d 1.

3. **Related Cases.** This case has not previously been before this Court.

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY.................................................................................ix

INTRODUCTION ........................................................................1

JURISDICTIONAL STATEMENT ........................................................5

STATEMENT OF ISSUES ................................................................6

STATEMENT OF THE CASE...............................................................6

    A.    The New York Convention and the Public Policy Exception...............6

    B.    The Underlying Arbitral Proceedings ....................................8

    C.    The Proceedings Below...................................................15

STANDARD OF REVIEW ................................................................17

SUMMARY OF ARGUMENT ...........................................................18

ARGUMENT ..............................................................................19

I.    The District Court Erred in Ruling that the Executive's Exclusive Constitutional Power to Recognize Foreign Governments Is Not a Matter of Public Policy...................................................................20

II.    The District Court Erred in Ruling that Recognition and Enforcement of the Award Would Not Violate U.S. Public Policy....................................29

CONCLUSION ...........................................................................41

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM: PERTINENT STATUTES AND OTHER PROVISIONS

# TABLE OF AUTHORITIES[*]

**Cases**

*Am. Ins. Ass'n v. Garamendi*,
  539 U.S. 396 (2003) ............................................................23

*AMTRAK v. ExpressTrak, L.L.C.*,
  330 F.3d 523 (D.C. Cir. 2003) ...........................................5

*Banco Nacional de Cuba v. Sabbatino*,
  376 U.S. 398 (1964) ............................................................23

*Bank of China v. Wells Fargo Bank & Union Trust Co.*,
  104 F. Supp. 59 (N.D. Cal. 1952) ......................................38

*BG Group plc v. Republic of Argentina*,
  572 U.S. 25 (2014) ..............................................................7

*Bowsher v. Synar*,
  478 U.S. 714 (1986) ............................................................22

*Commodities & Minerals Enter. v. CVG Ferrominera Orinoco, C.A.*,
  111 F.4th 1294 (11th Cir. 2024) .........................................35

[*]*Compañía De Inversiones Mercantiles S.A.*
  *v. Grupo Cementos De Chihuahua S.A.B. De C.V.*,
  58 F.4th 429 (10th Cir. 2023) ......................... 25, 26, 31, 32

*Corporación AIC, S.A. v. Hidroeléctrica Santa Rita S.A.*,
  66 F.4th 876 (11th Cir. 2023) .............................................31

[*]*Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V.*
  *v. Pemex-Exploración Y Producción*,
  832 F.3d 92 (2d Cir. 2016) ............................... 25, 26, 27

*Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*,
  932 F.3d 126 (3d Cir. 2019) ...............................................37

---

[*] Authorities upon which we chiefly rely are marked with asterisks.

*Enron Nig. Power Holding, Ltd. v. Federal Republic of Nigeria*,
    844 F.3d 281 (D.C. Cir. 2016) ........................................................ 20, 21

*Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petro. Corp.*
    40 F.4th 56 (2d Cir. 2022) ........................................................ 26

*Florasynth, Inc. v. Pickholz*,
    750 F.2d 171 (2d Cir. 1984) ........................................................ 37

*Guaranty Trust Co. v. United States*,
    304 U.S. 126 (1938) ........................................................ 21, 30

*Hanauer v. Woodruff*,
    82 U.S. 439 (1872) ........................................................ 22

[*] *Hardy Expl. & Prod. (India), Inc. v. Gov't of India,*
    *Ministry of Petroleum & Nat. Gas*,
    314 F. Supp. 3d 95 (D.D.C. 2018) ........................................................ 20

*Hurd v. Hodge*,
    334 U.S. 24 (1948) ........................................................ 21, 22

*In re Terrorist Attacks on September 11, 2001*,
    657 F. Supp. 3d 311 (S.D.N.Y. 2023), ........................................................ 38

*Jiménez v. Palacios*,
    250 A.3d 814 (Del. Ch. Aug. 2, 2019), ........................................................ 12, 30, 38

*Jin v. Parsons Corp.*,
    966 F.3d 821 (D.C. Cir. 2020) ........................................................ 5

*Kareem v. Haspel*,
    986 F.3d 859 (D.C. Cir. 2021) ........................................................ 11

*LLC SPC Stileks v. Republic of Moldova*,
    985 F.3d 871 (D.C. Cir. 2021) ........................................................ 37

*Matos Rodriguez v. Pan Am. Health Org.*,
    29 F.4th 706 (D.C. Cir. 2022) ........................................................ 17

*Medellin v. Texas*,
    552 U.S. 491 (2008) ........................................................ 7

*Metro. Mun. of Lima v. Rutas de Lima S.A.C.*,
141 F.4th 209 (D.C. Cir. 2025)...................................................................34

*Molecular Dynamics, Ltd. v. Spectrum Dynamics Med. Ltd.*,
143 F.4th 70 (2d Cir. 2025) ................................................. 31, 34, 35

*Nat'l Union Fire Ins. Co. v. Republic of China*,
254 F.2d 177 (4th Cir. 1958) ...............................................................22

*Oetjen v. Cent. Leather Co.*,
246 U.S. 297 (1918)..............................................................................30

*OI European Grp. B.V. v. Bolivarian Republic of Venezuela*,
73 F.4th 157 (3d Cir. 2023) ..................................................................37

*PDVSA United States Litig. Tr. v. Lukoil Pan Ams. LLC*,
65 F.4th 556 (11th Cir. 2023) ........................................ 12, 30, 36, 38

*Reid v. Covert*,
354 U.S. 1 (1957)..................................................................................24

*Republic of China v. Pang-Tsu Mow*,
101 F. Supp. 646 (D.D.C. 1951),.........................................................30

*Republic of Iraq v. ABB AG*,
768 F.3d 145 (2d Cir. 2014) .................................................................36

*Republic of Panama v. Rep. Nat. Bank of N.Y.*,
681 F. Supp. 1066 (S.D.N.Y. 1988) .....................................................38

*Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*,
No. 18-7044, 2019 U.S. App. LEXIS 17543 (D.C. Cir. May 1, 2019)......... 12, 30

*Schwartz v. Merrill Lynch & Co.*,
665 F.3d 444 (2d Cir. 2011) .................................................................34

*Stafford v. IBM*,
78 F.4th 62 (2d Cir. 2023) ...................................................................37

*State of Libya v. Strabag SE*,
No. 21-7128, 2022 U.S. App. LEXIS 14796 (D.C. Cir. May 27, 2022)..............34

*Tatneft v. Ukraine*,
21 F.4th 829 (D.C. Cir. 2021) ............................................................................17

*TermoRio S.A. v. Electranta S.P.*,
487 F.3d 928 (D.C. Cir. 2007) ...................................................... 20, 25, 26

*The Maret*,
145 F.2d 431 (3d Cir. 1944) ........................................... 22, 28, 31, 35

*United Paperworkers v. Misco, Inc.*,
484 U.S. 29 (1987) .............................................................................20

*United States v. Belmont*,
301 U.S. 324 (1937) ...........................................................................22

*United States v. Curtiss-Wright Exp. Corp.*,
299 U.S. 304 (1936) ...........................................................................23

*United States v. Pink*,
315 U.S. 203 (1942) ...................................................................... 22, 28

*United States v. Valentine*,
288 F. Supp. 957 (D.P.R. 1968) ........................................................24

*Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*,
87 F.4th 510 (D.C. Cir. 2023) ................................................ 1, 33, 34

*Youngstown Sheet & Tube Co. v. Sawyer*,
343 U.S. 579 (1952) ...........................................................................22

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*,
126 F.3d 15 (2d Cir. 1997) ................................................................34

*Zicherman v. Korean Air Lines Co.*,
516 U.S. 217 (1996) .............................................................................7

*Zivotofsky v. Kerry*,
576 U.S. 1 (2015) ...................................... 2, 21, 22, 23, 28, 30, 31, 36

*Zivotofsky v. Sec'y of State*,
725 F.3d 197 (D.C. Cir. 2013) ..........................................................28

**Constitutional Provisions**

U.S. Const., art. II, § 2 ........................................................................21

U.S. Const., art. II, § 3 ........................................................................21

**Statutes**

22 U.S.C. § 1650a ...........................................................................8, 33

28 U.S.C. § 1291 ...................................................................................5

28 U.S.C. § 1330 ...................................................................................5

28 U.S.C. § 1605 ...................................................................................5

9 U.S.C. § 10 .......................................................................................34

9 U.S.C. § 13 .......................................................................................32

9 U.S.C. § 16 .........................................................................................5

9 U.S.C. § 201 .......................................................................................1

**Treaties**

Convention on the Settlement of Investment Disputes between
  States and Nationals of Other States, Mar. 18, 1965, 575 U.N.T.S.
  159, 17 U.S.T. 1270 (entered into force Oct. 14, 1966) ........................................1

United Nations Convention on the Recognition and Enforcement
  of Foreign Arbitral Awards, June 10, 1958,
  21 U.S.T. 2517, 330 U.N.T.S. 38 ........................................ 1, 6, 19, 34

**Other Authorities**

Margaret L. Moses, *Chapter 11: Public Policy under the New York
  Convention: National, International, and Transnational, in*
  KATIA FACH GOMEZ AND ANA M. LOPEZ-RODRIGUEZ (EDS), 60 YEARS
  OF THE NEW YORK CONVENTION: KEY ISSUES AND FUTURE
  CHALLENGES 170-71 (Kluwer Law International 2019)........................................7

REINMAR WOLFF, NEW YORK CONVENTION ON THE RECOGNITION
  AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS:
  COMMENTARY 403 (2012)........................................................................ 8, 29, 35

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE
  UNITED STATES (Am. L. Inst. 1986) .............................................................. 21, 30

RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL
  ARBITRATION (Am. L. Inst. 2015) ................................................................ 21, 32

THE FEDERALIST NO. 42 (James Madison) (Jacob E. Cooke ed., 1961)..................23

THE FEDERALIST NO. 44 (James Madison) (Jacob E. Cooke ed., 1961)..................23

U.N. ESCOR, Report of the Committee on the Enforcement of
  International Arbitral Awards, U.N. Doc. E/2704 and
  Corr. 1, E/AC.42/rev.1 (1955) .................................................................7

Yuliya Zeynalova, *The Law on Recognition and Enforcement of
  Foreign Judgments: Is It Broken and How Do We Fix It?*,
  31 BERKELEY J. INT'L L. 150 (2013).....................................................32

# GLOSSARY

| | |
|---|---|
| **ICSID** | International Centre for Settlement of Investment Disputes |
| **ICSID Convention** | Convention on the Settlement of Investment Disputes between States and Nationals of Other States |
| **National Assembly** | The Venezuelan National Assembly of 2015 and its leadership, the only democratically elected government of the Bolivarian Republic of Venezuela recognized by the United States |
| **New York Convention** | United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards |
| **Republic (or Venezuela)** | Bolivarian Republic of Venezuela |
| **VUS** | Venezuela U.S. S.R.L. |
| **PCA** | Permanent Court of Arbitration |

**INTRODUCTION**

The present appeal is different from a prior appeal brought by the Bolivarian Republic of Venezuela (the "Republic" or "Venezuela") in *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela*, 87 F.4th 510 (D.C. Cir. 2023). Unlike the prior appeal which dealt with the enforcement of an arbitral award rendered under the auspices of the International Centre for Settlement of Investment Disputes (ICSID) pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, Mar. 18, 1965, 575 U.N.T.S. 159, 17 U.S.T. 1270 (entered into force Oct. 14, 1966) (the "ICSID Convention"), the current appeal involves recognition and enforcement of a foreign arbitral award under the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 38 (the "New York Convention"), as implemented by the Federal Arbitration Act (FAA), 9 U.S.C. § 201 *et seq*. This distinction results in two key differences, which necessitate a different outcome from *Valores*.

First, under Article V(2)(b) of the New York Convention, U.S. courts may refuse to recognize and enforce a foreign arbitral award if recognition and enforcement would violate U.S. public policy. No such exception is provided for under the ICSID Convention which, as the district court recognized, means that this Court's decision in *Valores* "may not strictly decide this case." JA109.

Second, unlike an ICSID award, which statutorily must be enforced as if it were a final judgment of a U.S. state court, under the New York Convention a U.S. court must take the affirmative step of recognizing the foreign arbitral award and converting it to a U.S. judgment in the first instance, giving it the imprimatur of the U.S. judiciary. In other words, confirming this award as a U.S. judgment means that a U.S. court has endorsed the arbitral tribunal's acts and rulings as consistent with U.S. public policy.

Recognizing and enforcing this award under the New York Convention would violate the clear public policy of the U.S. Executive's exclusive power to recognize foreign governments—a fundamental principle of U.S. constitutional law that is rooted in this nation's foundational system of separation of powers. *See Zivotofsky v. Kerry*, 576 U.S. 1, 14 (2015) ("[T]he Nation must have a single policy regarding which governments are legitimate in the eyes of the United States and which are not."). The *Valores* Court did not have to grapple with these issues because it was enforcing an ICSID award, which statutorily must be treated as if it were already a U.S. judgment, thus removing the step of having to recognize and convert the award into a U.S. judgment in the first instance as required under the New York Convention. These issues cannot be side-stepped in this case.

In 2019, after the then-president of Venezuela, Nicolás Maduro, claimed victory in a widely discredited election, the Venezuelan National Assembly

declared its president, Juan Guaidó, as the Interim President of the Republic under Article 233 of the Venezuelan constitution. The U.S. President immediately recognized the National Assembly of 2015 and its leadership (the "National Assembly") as the only legitimate government of Venezuela. In consequence, only the National Assembly and its representatives have any authority to speak and act on behalf of the Republic as a matter of U.S. law. The U.S. Executive recognized the National Assembly as part of a broader policy of promoting democracy in Venezuela and supporting the liberties of the Venezuelan people against the oppressive Maduro regime. The Executive has also taken steps to shield the assets of the Republic in the United States to preserve them for the benefit of the Venezuelan people in an eventual transition to democracy.

While the parties were awaiting a decision on liability in the underlying arbitral proceedings, the arbitral tribunal allowed representatives of the unrecognized, illegitimate Maduro regime to replace representatives of the National Assembly as the Republic's counsel. Neither the tribunal nor the Appellee, Venezuela U.S. S.R.L. (VUS), notified the Republic's counsel of this change in representation. It was not until after the tribunal rendered an interim decision on liability, and that decision became public, that the Republic's counsel learned of the change in representation. Representatives of the Maduro regime then continued to act purportedly on behalf of the Republic through the final, damages

phase of the proceedings. The tribunal thus rendered a final award purportedly against the Republic without the participation of the U.S. recognized government of Venezuela.

VUS then sought to enforce the award in the United States in a transparent effort to reach assets of the Republic in which the Maduro regime has no cognizable interest. Because a U.S. court cannot recognize anyone other than the representatives of the National Assembly as acting for and binding the Republic, it necessarily follows that it cannot recognize and enforce an award against Venezuela in which only the unrecognized, illegitimate Maduro regime was permitted to act purportedly on behalf of the Republic. In effect, converting the award into a U.S. judgment against the Republic would amount to a recognition of the Maduro regime as acting on behalf of Venezuela in violation of the United States' policy of speaking with one voice on the recognition of foreign governments, here, the recognition of the National Assembly as the only legitimate government of the Republic.

The district court nevertheless held that this award may be confirmed as a U.S. judgment. The court construed the public policy exception under Article V(2)(b) of the New York Convention narrowly to exclude the Executive's exclusive constitutional power to recognize foreign governments. It further held that, even if the recognition power were a matter of U.S. public policy, recognition

and enforcement of the award would not run afoul of that public policy based on this Court's reasoning in *Valores*. The district court acknowledged the difference between *Valores* and this case but failed to apprehend the significance of the difference between enforcing an award under the ICSID Convention and enforcing an award under the New York Convention. The district court's rulings were legal error and so its decision confirming the award should be reversed.

## JURISDICTIONAL STATEMENT

The district court had personal and subject matter jurisdiction under the Foreign Sovereign Immunities Act (FSIA), because this is an action to enforce an arbitral award rendered against a foreign state under the New York Convention, to which the United States is a party, 28 U.S.C. § 1605(a)(6), and service of process was effected in accordance with the FSIA. 28 U.S.C. § 1330(a)-(b).

On June 9, 2025, the district court granted VUS' petition to recognize and enforce the award under the New York Convention and the FAA. JA95. On July 8, 2025, the Republic timely appealed. JA114. This Court has jurisdiction to review the district court's decision under 28 U.S.C. § 1291 and 9 U.S.C. § 16(a)(1)(D). *See Jin v. Parsons Corp.*, 966 F.3d 821, 824-825 (D.C. Cir. 2020); *AMTRAK v. ExpressTrak, L.L.C.*, 330 F.3d 523, 527 (D.C. Cir. 2003).

**STATEMENT OF ISSUES**

Under Article V(2)(b) of the New York Convention, "[r]ecognition and enforcement of an arbitral award may … be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country." The question in this appeal is:

Whether the district court erred in failing to apply the public policy exception of the New York Convention to refuse recognition and enforcement of a foreign arbitral award purportedly rendered against the Republic in proceedings that excluded the only U.S.-recognized, legitimate government of the Republic in contravention of the U.S. Executive's exclusive constitutional power to recognize foreign governments.

**STATEMENT OF THE CASE**

**A.      The New York Convention and the Public Policy Exception**

Recognition and enforcement of this award is governed by the New York Convention. Article V of the New York Convention sets forth several grounds for refusing to recognized or enforce an arbitral award. The relevant ground here is the public policy exception under Article V(2)(b).

As the U.N. committee that prepared the draft convention indicated in its report to the U.N. Conference, the public policy exception applies "to cases in which the recognition or enforcement of a foreign arbitral award would be

6

distinctly *contrary to the basic principles of the legal system* of the country where the award was invoked." U.N. ESCOR, Report of the Committee on the Enforcement of International Arbitral Awards § 49, U.N. Doc. E/2704 and Corr. 1, E/AC.42/rev.1 (1955) (emphasis added); *see also* Margaret L. Moses, *Chapter 11: Public Policy under the New York Convention: National, International, and Transnational, in* KATIA FACH GOMEZ AND ANA M. LOPEZ-RODRIGUEZ (EDS), 60 YEARS OF THE NEW YORK CONVENTION: KEY ISSUES AND FUTURE CHALLENGES 170-71 (Kluwer Law Int'l 2019) (explaining that the drafters of the New York Convention considered that the public policy exception was necessary to "prevent intrusion on state sovereignty if a foreign award was irreconcilable with the enforcing country's legal structure," and that Article V(2)(b) reflects the drafters' intent to strike "a balance between party autonomy and the state's interest in protecting its most fundamental principles").[2]

---

[2] It is well established that treaties are contracts between nations and are to be interpreted in accordance with basic contract principles including by discerning the contracting parties' intent. *BG Group plc v. Republic of Argentina*, 572 U.S. 25, 37 (2014). The intent of contracting parties to a treaty can be found through the drafting history of the treaty (or *travaux preparatoires*), and so the drafting history of the New York Convention should be considered when interpreting its meaning. *See Medellin v. Texas*, 552 U.S. 491, 507 (2008) ("Because a treaty ratified by the United States is 'an agreement among sovereign powers,' we have also considered as 'aids to its interpretation' the negotiation and drafting history of the treaty as well as 'the postratification understanding' of signatory nations.") (quoting *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226 (1996)).

In effect, "[t]he public policy defense serves as a safety-valve allowing the Contracting States to prevent intrusion into their legal system of awards they consider irreconcilable with it." REINMAR WOLFF, NEW YORK CONVENTION ON THE RECOGNITION AND ENFORCEMENT OF FOREIGN ARBITRAL AWARDS: COMMENTARY 403 (2012). The existence of this public policy safety-valve is a critical difference between the New York Convention and the ICSID Convention, which was the treaty at issue in *Valores*, because the ICSID Convention does not contain a public policy exception to the enforcement of ICSID awards. JA109.

The New York Convention differs from the ICSID Convention in another important way. Under the U.S. statute implementing the ICSID Convention, "the pecuniary obligations" of an ICSID award "shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." 22 U.S.C. § 1650a(a). Application of the FAA is expressly excluded by the ICSID implementing statute. *Id*. Those limitations are not present in the New York Convention.

## B.      The Underlying Arbitral Proceedings

### 1.      *The Jurisdiction and Liability Phases*

In March 2013, VUS (a Barbadian company) filed a notice of arbitration against the Republic, alleging that the Republic had breached certain provisions of the Agreement between the Government of Barbados and the Republic of

Venezuela for the Promotion and Protection of Investments (the "Investment Treaty") in connection with a joint venture between VUS and the Republic relating to oil production in Venezuela. The arbitration proceeded under the UNCITRAL Arbitration Rules before the Permanent Court of Arbitration (PCA) in The Hague, Netherlands. The Republic initially participated in the proceedings under the then-U.S.-recognized government of President Maduro, and was represented by Curtis, Mallet-Prevost, Colt & Mosle LLP ("Curtis"). *See* JA62 (¶ 3).

The arbitration was divided into three phases: jurisdiction, liability and damages. In March 2014, after submitting their respective statement of claim and statement of defense, the parties agreed to address the Republic's initial objection to jurisdiction. Following briefing, the tribunal conducted a hearing in July 2014, and ultimately dismissed the Republic's objection in July 2016. JA62 (¶ 4).

The parties proceeded to discovery and briefing on the Republic's remaining jurisdictional objections and the merits on liability. Following a two-day hearing in November 2017, the parties filed their respective submissions on costs for the jurisdiction and liability phases of the proceedings. The proceedings remained inactive while the tribunal deliberated on those matters. JA63 (¶ 5).

### 2. *The United States Recognizes a New Government in Venezuela*

The political situation changed dramatically in Venezuela while the tribunal's decision on jurisdiction and liability was pending. On May 20, 2018,

Maduro claimed to have "won" another presidential term in a highly disputed election that was widely reported in the media. JA63 (¶ 6); *see also* JA66-71. In response, on January 23, 2019, the Venezuelan National Assembly declared its president, Juan Guaidó, as the Interim President of the Republic pursuant to Article 233 of the Venezuelan Constitution. JA63-64 (¶ 7).

That same day, the U.S. President recognized President Guaidó and the National Assembly as the only legitimate government of Venezuela and explicitly derecognized the illegitimate Maduro regime. *Id.*; *see also* JA72-78. In recognizing President Guaidó, the United States took certain steps to protect Venezuelan assets in the United States from the acts and abuses of the Maduro regime and preserve them for use by the U.S.-recognized government for the benefit of the Venezuelan people.[3] The United States also denounced the Maduro dictatorship for its

---

[3] *See, e.g.*, WHITE HOUSE, FACT SHEETS, PRESIDENT DONALD J. TRUMP IS CUTTING OFF FINANCIAL RESOURCES TO MADURO AND HIS CRONIES (Aug. 6, 2019) (referring to measures taken for the purpose of "isolat[ing] Maduro's illegitimate regime from the global financial system and the international community"), https://trumpwhitehouse.archives.gov/briefings-statements/president-donald-j-trump-cutting-off-financial-resources-maduro-cronies/; U.S. DEP'T OF TREASURY, PRESS RELEASE BY SEC. OF TREASURY STEPHEN T. MNUCHIN, TREASURY SANCTIONS VENEZUELA'S STATE-OWNED OIL COMPANY PETROLEOS DE VENEZUELA, S.A. (Jan. 28, 2019) ("Today's designation of PdVSA will help prevent further diverting of Venezuela's assets by Maduro and preserve these assets for the people of Venezuela. The path to sanctions relief for PdVSA is through the expeditious transfer of control to the Interim President or a subsequent, democratically elected government."), https://home.treasury.gov/news/press-releases/sm594. It is well settled that a court may take judicial notice of "a fact that

"rampant human rights abuses" and repression, and confirmed its "support for the people of Venezuela [who] have courageously spoken out against Maduro and his regime and demanded freedom and the rule of law." JA76, 80-81. These goals were further advanced by blocking the property of the Republic in the United States and handing control over all of the Republic's assets in United States to the U.S.-recognized government.[4]

As of the date the U.S. Executive recognized President Guaidó and the National Assembly, U.S. courts including this Court have consistently recognized the National Assembly and its representatives as the sole legitimate government of

---

is not subject to reasonable dispute if it either 'is generally known within the trial court's territorial jurisdiction or 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Kareem v. Haspel*, 986 F.3d 859, 866 n.7 (D.C. Cir. 2021) (taking judicial notice of "facts regarding the Syrian conflict that [the] complaint does not dispute because they are generally known and can be readily determined from reliable sources, such as the Congressional Research Service and State Department reports").

[4] *See* WHITE HOUSE, STATEMENT AND RELEASES, STATEMENT FROM THE PRESS SECRETARY REGARDING AN EXECUTIVE ORDER "BLOCKING PROPERTY OF THE GOVERNMENT OF VENEZUELA" (Aug. 6, 2019) ("This Executive Order blocks all property and interests in property of the Government of Venezuela that are within the jurisdiction of the United States."),
https://trumpwhitehouse.archives.gov/briefings-statements/statement-press-secretary-regarding-executive-order-blocking-property-government-venezuela/;
U.S. EMBASSY & CONSULATES IN MEXICO, PRESIDENT DONALD J. TRUMP SUPPORTS THE VENEZUELAN PEOPLE'S EFFORTS TO RESTORE DEMOCRACY (Jan. 30, 2019) ("Venezuela's legitimate government, led by Guaidó, must be allowed to safeguard its assets for the benefit of the Venezuelan people."),
https://mx.usembassy.gov/president-donald-j-trump-supports-the-venezuelan-peoples-efforts-to-restore-democracy/.

the Republic in proceedings before them, as they are constitutionally bound to do. *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela*, No. 18-7044, 2019 U.S. App. LEXIS 17543, at \*1-2 (D.C. Cir. May 1, 2019); *accord, e.g.*, *PDVSA United States Litig. Tr. v. Lukoil Pan Ams. LLC*, 65 F.4th 556, 562-63 (11th Cir. 2023) ("*Lukoil*"); *Jiménez v. Palacios*, 250 A.3d 814, 830-31 (Del. Ch. Aug. 2, 2019), *aff'd*, 237 A.3d 68 (Del. 2020).[5]

Although Mr. Guaidó is no longer the leader of the National Assembly, to date the U.S. Executive continues to recognize the National Assembly and its leadership as the only legitimate government of Venezuela. JA65 (¶ 12); *see also* JA79-82; *Lukoil*, 65 F.4th at 561 ("The executive branch has given no indication that it will change its longstanding position that the Maduro government is illegitimate."). The Executive has repeatedly affirmed its support for the National Assembly's "efforts … to return democracy to Venezuela," and emphasized that "[m]embers of the National Assembly have the democratic aspirations of the Venezuelan people at heart."[6]

---

[5] As recently as September 2025, the U.S. Government reaffirmed that only lawyers acting at the instruction of the National Assembly are recognized as counsel for the Republic. Statement of Interest of the United States at 3-5, *Fernando Fraiz Trapote v. Bolivarian Republic of Venezuela*, No. 1:23-cv-02118, (D.D.C. Sept. 26, 2025), ECF No. 57.

[6] U.S. STATE DEP'T, PRESS BRIEFING, NED PRICE, DEPARTMENT SPOKESPERSON, (Jan. 3, 2023), https://www.state.gov/briefings/department-press-briefing-january-3-2023/; Exhibit A to Statement of Interest of the United States: Letter of

This support has continued after the most recent July 28, 2024 election in which Edmundo González Urrutia emerged as "the rightful president of the Republic," as recognized by the U.S. Executive.[7] Moreover, the U.S. Executive has continued to make clear that recognition of the National Assembly was part of a broader foreign policy aimed at supporting democracy and combatting corruption and human rights abuses by the Maduro regime.[8]

———————————

Ambassador Michael G. Kozak, *Petróleos de Venezuela, S.A. et al. v. MUFG Union Bank, N.A. et al.*, No. 1:19-cv-10023, (S.D.N.Y. Aug. 29, 2025), ECF No. 393-1.

[7] U.S. STATE DEP'T, READOUT OF SECRETARY RUBIO'S CALL WITH THE RIGHTFUL PRESIDENT OF VENEZUELA GONZÁLEZ URRUTIA AND VENEZUELAN DEMOCRATIC OPPOSITION LEADER MACHADO (Jan. 22, 2025), https://www.state.gov/secretary-rubios-call-with-the-rightful-president-of-venezuela-gonzalez-urrutia-and-venezuelan-democratic-opposition-leader-machado.

[8] U.S. STATE DEP'T, PRESS STATEMENT BY SECRETARY OF STATE MARCO RUBIO, TERRORIST DESIGNATIONS OF CARTEL DE LOS SOLES (Nov. 16, 2025) ("Based in Venezuela, the Cartel de los Soles is headed by Nicolás Maduro and other high-ranking individuals of the illegitimate Maduro regime who have corrupted Venezuela's military, intelligence, legislature, and judiciary. Neither Maduro nor his cronies represent Venezuela's legitimate government"), https://www.state.gov/releases/office-of-the-spokesperson/2025/11/terrorist-designations-of-cartel-de-los-soles/; PRESIDENTIAL ACTION ON EXECUTIVE ORDER 13692, IMPOSING TARIFFS ON COUNTRIES IMPORTING VENEZUELAN OIL (Mar. 24, 2025) ("The actions and policies of the Maduro regime that were the basis for those orders continue to pose an unusual and extraordinary threat to the national security and foreign policy of the United States. These actions include: (i) The systematic undermining of democratic institutions through the suppression of free and fair elections and the illegitimate consolidation of power by the regime of Nicolás Maduro; (ii) Endemic economic mismanagement and public corruption at the expense of the Venezuelan people and their prosperity; (iii) The regime's responsibility for the deepening humanitarian and public health crisis in Venezuela; and (iv) The destabilization of the Western Hemisphere through the

In accordance with U.S. law, Curtis has continued to represent the Republic only at the instruction of the National Assembly. JA65 (¶ 12).

### 3. The Damages Phase

As the political situation continued to unfold in Venezuela, unauthorized changes in the representation of the Republic affected the nature of the arbitral proceedings.

In February 2021, the arbitral tribunal issued a decision on jurisdiction and liability, in which it rejected the majority of VUS's claims but found the Republic liable under the Investment Treaty for non-payment of certain dividends to VUS. That decision revealed that, unbeknownst to the National Assembly or its representatives, the Maduro regime had purportedly appointed new counsel for the Republic in the arbitral proceedings. JA64 (¶ 9). Specifically, the decision states that the Republic had been represented by Curtis until June 30, 2020, at which point representation shifted to the Argentinian law firm of Guglielmino & Associados S.A. ("Guglielmino"). *Id.* (¶ 2). Neither the U.S.-recognized government nor Curtis received notice of this purported replacement, and they did not learn of this change until the decision was made public shortly after it was

_____

forced migration of millions of Venezuelans, imposing significant burdens on neighboring countries."), https://www.whitehouse.gov/presidential-actions/2025/03/imposing-tariffs-on-countries-importing-venezuelan-oil/.

issued. JA64-65 (¶ 10). In effect, the tribunal accepted the replacement of the Republic's counsel without notifying Curtis or the U.S.-recognized government—notwithstanding the fact that earlier in the arbitration, the PCA had notified Curtis when VUS replaced its counsel.[9]

The Maduro regime, through Guglielmino, continued to act purportedly on behalf of the Republic for the remaining damages phase of the proceedings. JA65 (¶ 11). VUS and the Maduro regime submitted their memorials as to damages between April and October 2021, culminating in a two-day hearing in February 2022. *Id.* No representatives from the U.S.-recognized government participated in the damages phase of the proceedings. *Id.* On November 4, 2022, the tribunal issued the final award, in which it awarded VUS approximately $59 million for the unpaid dividends, plus arbitration costs, legal fees, and interest. JA40 (¶ 107).

### C. The Proceedings Below

On December 27, 2022, VUS filed a petition seeking to confirm the award in the U.S. District Court for the District of Columbia. The Republic opposed VUS' petition. It argued that recognition and enforcement of the award would violate the U.S. Executive's recognition power, which falls within the public policy exception

---

[9] On February 17, 2020, the PCA advised Curtis that VUS had changed its counsel effective February 15, 2020. The PCA invited VUS to provide the Republic with a copy of the relevant power of attorney or letter of representation. JA64 (¶ 8).

under Article V(2)(b) of the New York Convention, and that the public policy exception is not a waivable defense. JA99-100.

VUS filed a reply arguing (i) that the Republic had waived its right to oppose the enforcement of the award on public policy grounds by failing to object to the Maduro regime's representation in the arbitration; (ii) that the Executive's recognition power is not a public policy that falls within Article V(2)(b) of the New York Convention; and (iii) that even if it did, enforcement of the award would not violate that public policy. JA102.

On June 9, 2025, the district court issued its Order and Memorandum Opinion. It rejected the Republic's argument that the public policy exception is not waivable defense but held that the Republic had not waived its public policy arguments because the Republic could not have known that VUS would seek to enforce the arbitral award in the United States, where only the National Assembly is recognized. JA102-104.

The district court noted that the Republic "makes a facially plausible case that enforcement of the Final Award would run 'distinctly contrary to the *basic principles of the [U.S.] legal system*' and thereby fall within the public policy exception's ambit." JA105-106 (internal citations omitted). Nevertheless, it held that, while "the caselaw offers no clear answer either way," the public policy exception is to be narrowly construed, and concluded that the Executive's

recognition power is not a matter of public policy that would fall within the New York Convention's public policy exception. JA106-8.

The district court further held that, even if the Executive's recognition power were a matter of public policy within the meaning of Article V(2)(b), it would not be violated by recognizing and enforcing the award. The district court acknowledged that, given the distinction between the ICSID Convention and New York Convention, this Court's holding in *Valores* "may not strictly decide this case." JA109. It nevertheless relied on *Valores* to conclude that the recognition and enforcement of the award would not violate the Executive's recognition of the National Assembly. JA109-13.

The Republic timely appealed. JA114.

## STANDARD OF REVIEW

Confirmation of an arbitral award under the New York Convention is reviewed *de novo* with respect to questions of law. *Tatneft v. Ukraine*, 21 F.4th 829, 835 (D.C. Cir. 2021). The interpretation of an international treaty is similarly subject to *de novo* review. *Matos Rodriguez v. Pan Am. Health Org.*, 29 F.4th 706, 712 (D.C. Cir. 2022).

## SUMMARY OF ARGUMENT

Recognition and enforcement of foreign arbitral awards is not automatic or absolute. Under Article V(2)(b) of the New York Convention, a U.S. court may refuse recognition or enforcement of an arbitral award based on U.S. public policy.

**I.** The New York Convention's public policy exception is implicated when recognizing or enforcing an award would be repugnant to fundamental notions of what is decent and just in this country, meaning that it would clearly tend to undermine individual rights, the public interest, or public confidence in the administration of the law. This exception is broad enough to encompass foundational principles of the U.S. legal system including constitutional norms such as the Executive's exclusive power to recognize foreign governments. This recognition doctrine and the underlying separation of powers principles are rooted in this nation's basic constitutional structure and are meant to afford stability and predictability in dealings with foreign governments in the United States.

**II.** Recognizing and enforcing an award under the New York Convention requires a U.S. court to endorse the award as conforming to these fundamental norms. Enforcing VUS' award would directly contravene the Executive's exclusive recognition power because it would be an endorsement of the arbitral tribunal's decision to permit only representatives of the unrecognized, illegitimate Maduro regime to act purportedly on behalf of the Republic. It would open the

doors of U.S. courts to litigants who defied the U.S. Executive's recognition of the National Assembly by choosing to deal only with the Maduro regime but then seek the U.S. Judiciary's imprimatur to enforce the award against property in which the Maduro regime has no cognizable interest as a matter of U.S. law.

## ARGUMENT

Article V of the New York Convention empowers courts to refuse recognition and enforcement of foreign arbitral awards in certain enumerated circumstances. Specifically, Article V(2)(b) provides that "[r]ecognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country." New York Convention, art. V(2)(b).

The Executive's exclusive recognition power is precisely the type of foundational norm that qualifies as a public policy within the ambit of Article V(2)(b). Given the Executive's recognition of the National Assembly as the only legitimate government of the Republic, recognition and enforcement of an award rendered in proceedings in which only the unrecognized, illegitimate Maduro regime was permitted to act purportedly for the Republic would directly contravene the Executive's constitutional authority and violate U.S. public policy.

## I. The District Court Erred in Ruling that the Executive's Exclusive Constitutional Power to Recognize Foreign Governments Is Not a Matter of Public Policy

To start, the party invoking Article V(2)(b) must identify a relevant public policy. *Enron Nig. Power Holding, Ltd. v. Federal Republic of Nigeria*, 844 F.3d 281, 287 (D.C. Cir. 2016). The "public policy must be 'explicit' and 'well-defined and dominant, and is to be ascertained by reference to the laws and legal precedents.'" *Hardy Expl. & Prod. (India), Inc. v. Gov't of India, Ministry of Petroleum & Nat. Gas*, 314 F. Supp. 3d 95, 109 (D.D.C. 2018) (quoting *United Paperworkers v. Misco, Inc.*, 484 U.S. 29, 43 (1987)).

Article V(2)(b) applies not only when enforcement affects "individual rights of personal liberty or of private property," but also when it "tends clearly to undermine the public interest" and "the public confidence in the administration of the law." *Enron*, 844 F.3d at 289 (quoting *TermoRio S.A. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007)); *see, e.g.*, *Hardy*, 314 F. Supp. 3d at 109-10, 113-14 (refusing to enforce portions of arbitral award under the New York Convention because they violated U.S. public policies of respecting other nations' sovereignty and prohibiting punitive damages against foreign states, as expressed in the FSIA, international comity principles, and supporting case law). Any refusal to apply Article V(2)(b) cannot be based on a determination that a party has waived or forfeited its rights, "because public policy violations implicate the integrity of the

enforcing court." *Enron*, 844 F.3d at 288 (citing *Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948); RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL ARBITRATION § 2-16(b) (Am. L. Inst. 2015)).[10]

The Executive's exclusive recognition power is precisely the type of public policy that this exception was meant to capture. Under the well-established recognition doctrine, which is grounded in Article II, Sections 2 and 3 of the U.S. Constitution, the Executive has the exclusive constitutional power to recognize a government of a foreign state, and such determinations are conclusive not only of which representatives may speak and act on behalf of that state in U.S. courts, but also which regime's actions may bind that state. *See Zivotofsky*, 576 U.S. at 11-15 ("Recognition is a 'formal acknowledgement' . . . 'that a particular regime is the effective government of a state.'") (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 203, cmt. a, p. 84 (1986)); *Guaranty Trust Co. v. United States*, 304 U.S. 126, 138 (1938) (holding that the Executive's

---

[10] While the district court agreed that the Republic had not waived its public policy defense, it erred in ruling that the public policy defense is waivable. JA102-04. In *Enron*, this Court noted that "parties cannot waive their rights under Article V(2)(b) because public policy violations implicate the integrity of the enforcing court." *Enron*, 844 F.3d at 288. While the question in *Enron* arose in connection to a contractual provision, this Court's reasoning does not limit a party's inability to waive Article V(2)(b) to contractual waivers. Therefore, in addition to the reasons articulated by the district court, the Republic could not have waived or otherwise forfeited its public policy defense because it is not waivable.

"action in recognizing a foreign government . . . is conclusive on all domestic courts"); *see also Nat'l Union Fire Ins. Co. v. Republic of China*, 254 F.2d 177, 186 (4th Cir. 1958); *The Maret*, 145 F.2d 431, 442 (3d Cir. 1944).

Moreover, the concept of separation of powers on which the recognition doctrine is set was designed to safeguard the public interest. *See, e.g.*, *Bowsher v. Synar*, 478 U.S. 714, 721-22 (1986) ("The declared purpose of separating and dividing the powers of government, of course, was to '[diffuse] power the better to secure liberty.'") (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring)). Courts thus have no authority to contravene or disregard the Executive's decision to recognize one government and derecognize another. *See Zivotofsky*, 576 U.S. at 18-19; *United States v. Pink*, 315 U.S. 203, 229-30 (1942); *United States v. Belmont*, 301 U.S. 324, 328-30 (1937).

The recognition doctrine is without question a fundamental and basic principle of the U.S. legal system. The Constitution, as the supreme law of the land, represents the highest source of public policy. *See, e.g.*, *Hurd*, 334 U.S. at 34-35 (1948) ("The power of the federal courts to enforce the terms of private agreements is at all times exercised subject to the restrictions and limitations of the public policy of the United States as manifested in the Constitution, treaties, federal statutes, and applicable legal precedents."); *Hanauer v. Woodruff*, 82 U.S. 439, 442 (1872) ("There can be no public policy in this country which contravenes

the law of the land."). The recognition doctrine arises out of the core "concern for uniformity in this country's dealings with foreign nations," which "animated the Constitution's allocation of the foreign relations power to the National Government in the first place." *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 413 (2003) (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427 n.25 (1964)).

The doctrine thus serves the overarching national interest in ensuring the United States speaks with one voice on the international stage. *See Zivotofsky*, 576 U.S. at 14; *see also* THE FEDERALIST NO. 42, at 279 (James Madison) (Jacob E. Cooke ed., 1961) ("If we are to be one nation in any respect, it clearly ought to be in respect to other nations."); THE FEDERALIST NO. 44, at 299 (James Madison) (Jacob E. Cooke ed., 1961) (emphasizing "the advantage of uniformity in all points which relate to foreign powers"). As the Supreme Court explained in *Zivotofsky*, "[r]ecognition is an act with immediate and powerful significance for international relations." 576 U.S. at 21; *see also United States v. Curtiss-Wright Exp. Corp.*, 299 U.S. 304, 319-20 (1936) (noting that uniformity with respect to positions on foreign affairs is required in order to prevent international "embarrassment").

Grounded in the Constitution, separation-of-power principles, and historical practice, the recognition doctrine is of a higher order than the modern policy favoring the enforcement of foreign arbitral awards under the New York

Convention. As the Supreme Court has made clear, international law and treaties cannot supersede the Constitution. *See Reid v. Covert*, 354 U.S. 1, 16 (1957). This is because the "United States is entirely a creature of the Constitution." *Id.* at 5-6. "Its power and authority have no other source. It can only act in accordance with all the limitations imposed by the Constitution." *Id.* at 6. By signing and ratifying the New York Convention, the United States did not and could not have empowered the Judiciary to infringe the Executive's recognition power by granting authority to confirm foreign arbitral awards that recognize a different regime than the one recognized by the Executive as the effective government of a foreign state. Indeed, "[n]o treaty can authorize the judiciary to undertake an inquiry forbidden to it by the Constitution." *United States v. Valentine*, 288 F. Supp. 957, 985-86 (D.P.R. 1968).

The district court agreed with the Republic that "the President's recognition power 'is rooted in the Constitution as repeatedly affirmed by the Supreme Court.'" JA105 (internal citations omitted). Consequently, it noted that the Republic "makes a facially plausible case that enforcement of the Final Award would run 'distinctly contrary to the *basic principles of the [U.S.] legal system*' and thereby fall within the public policy exception's ambit." JA105-106 (internal citations omitted). Nevertheless, the district court concluded that the Executive's

recognition power was not a matter of public policy within the meaning of Article V(2)(b). That was legal error.

The district court reasoned that the public policy exception is to be narrowly construed and that it applies "only where enforcement would violate the forum state's most basic notions of morality and justice." JA106 (quoting *TermoRio*, 487 F.3d at 938). But the articulation of the public policy standard in those terms does not exclude foundational constitutional norms and structures such as the Executive recognition doctrine.

This Court and other circuits have applied an identical public policy exception in deciding whether to enforce awards that were annulled or set aside by foreign courts under Article V(1)(e) of the New York Convention. *See TermoRio*, 487 F.3d at 939 (recognizing a "public policy gloss" on the set-aside provision of the New York Convention); *see also Compañía De Inversiones Mercantiles S.A. v. Grupo Cementos De Chihuahua S.A.B. De C.V.*, 58 F.4th 429, 446-49 (10th Cir. 2023) ("*CIMSA*") (collecting cases); *Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploración Y Producción*, 832 F.3d 92, 106-07 (2d Cir. 2016) ("*Pemex*") (noting that "[a] judgment is unenforceable as against public policy to the extent that it is 'repugnant to fundamental notions of what is decent and just'"). Indeed, this Court equated the public policy analysis under Articles V(1)(e) and V(2)(b), noting that it would be "strange indeed" to

have different public policy standards under each provision. *TermoRio*, 487 F.3d at 938-39. And under Article V(1)(e), courts have found broader public policy grounds for refusing to recognize the decision of a foreign court setting aside an arbitral award. *See Pemex*, 832 F.3d 92; *CIMSA*, 58 F.4th at 466-69.

In fact, when applying the public policy exception under the materially similar Panama Convention, the Second Circuit looked to constitutional principles to justify its refusal to recognize a foreign judgment annulling an arbitral award. *See Pemex*, 832 F.3d at 108-9.[11] In *Pemex*, the Second Circuit affirmed a district court's refusal to recognize a judgment by a Mexican court annulling an arbitral award made in Mexico. *Id.* at 112. Among other reasons, the Second Circuit affirmed the refusal to recognize the Mexican court's annulment of the arbitral award because the Mexican court's retroactive application of laws to cancel the underlying contract was deemed repugnant to the constitutionally established principle of non-retroactive application of laws in the United States. *Id.* at 108. The

---

[11] The Second Circuit noted that there is "no substantive difference" between the Panama Convention and the New York Convention. *Pemex*, 832 F.3d at 105. The public policy exception under the Panama Convention mirrors the same provision under the New York Convention. *See TermoRio*, 487 F.3d at 933 ("[T]he relevant provisions of the Panama Convention and the New York Convention are substantively identical."); *see also Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petro. Corp.*, 40 F.4th 56, 62 n.2 (2d Cir. 2022) ("It has long been established, and is not questioned here, that the Panama Convention is substantively identical to the New York Convention and that authority interpreting one may be applied to the other.").

Second Circuit noted that "[a]nti-retroactivity is a principle embedded in 'several provisions' of the Constitution." *Id.* The Second Circuit also affirmed refusal to recognize the annulment judgment on the basis that "enforcement of [] Mexican law amounted to a taking of private property without compensation for the benefit of the government[, which] [i]n the United States, [] would be an unconstitutional taking." *Id.* at 110.[12]

An even more prominent constitutional provision is implicated in this case with the Executive's power to recognize foreign governments. As the Second Circuit acknowledged in *Pemex* regarding retroactivity, the recognition doctrine is similarly "deeply rooted in [Supreme Court] jurisprudence." *Id*. at 108. Narrowing the public policy grounds for refusing to recognize and enforce an award would be contrary to the application of the public policy exception in deciding whether to recognize and enforce a foreign judgment annulling an award, resulting in inconsistent and inequitable outcomes depending on the procedural posture of the case. In short, the district court erred in hold that the public policy exception must be construed so narrowly so as to exclude basic constitutional norms such as the Executive's exclusive power to recognize foreign governments.

---

[12] As an additional ground for affirming refusal to recognize the annulment, the Second Circuit stated that "[g]iving effect to [a party's] twelfth-hour invocation of sovereign immunity shatters [] investment-backed expectation in contracting, thereby impairing one of the core aims of contract law." *Pemex*, 832 F.3d at 108.

Even if the public policy exception were as narrow as the district court believed (which it is not), the Executive recognition doctrine would still qualify as a matter of public policy within the meaning of Article V(2)(b). The recognition power is not simply the Executive's method for noting which government it believes won an election, but is also a critical tool at the Executive's disposal to support and promote a legitimate government over an illegitimate regime. As this Court has noted, "[r]ecognition is [] a critical step in establishing diplomatic relations with the United States." *Zivotofsky v. Sec'y of State*, 725 F.3d 197, 205 (D.C. Cir. 2013) (internal citations omitted). The Supreme Court has further observed that government recognition is part of the broader set of tools available to the Executive in its exercise of foreign policy. *Zivotofsky*, 576 U.S. at 11, 18 ("The President's authority 'is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition.'") (quoting *Pink*, 315 U.S. at 229); *The Maret*, 145 F.2d at 440 ("The authority of the Executive to determine a political matter such as the recognition of a foreign government is not limited to a determination of the government to be recognized. It includes the power to determine the policy which is to govern the question of recognition.").

This case presents a unique set of facts illustrating precisely why the Executive recognition doctrine is a matter of U.S. public policy under even the

narrower standard suggested by the district court. The Executive's use of the recognition power here reflects a broader attempt by the United States to throw its weight behind the National Assembly and the Venezuelan people as they oppose the corrupt and abusive Maduro dictatorship and to shield the Republic's assets from the Maduro regime to support a democratic transition in Venezuela. Recognizing a legitimate government to support the Venezuelan people's fundamental freedoms and oppose the human rights abuses of an illegitimate regime go directly to basic notions of morality and justice.

This Court should thus reverse the district court's ruling and hold that the recognition doctrine is a relevant public policy under the New York Convention.

## II.     The District Court Erred in Ruling that Recognition and Enforcement of the Award Would Not Violate U.S. Public Policy

Recognition and enforcement of VUS' award would flatly contradict the U.S. Executive's recognition of the National Assembly as the only legitimate government of Venezuela. It would give this Court's imprimatur to the illegitimate Maduro regime's purported representation of the Republic in the arbitral proceedings by transforming the award into a U.S. judgment binding on the Republic, even though it is indisputable that the Maduro regime has no authority to speak for and bind the Republic as a matter of U.S. law. Indeed, Article V(2)(b) makes clear that "it is not the award itself but its recognition and enforcement that needs to stand the public policy test." WOLFF, NEW YORK CONVENTION at 414.

Again, the Executive's recognition of a foreign government refers to the "formal acknowledgement . . . that a particular regime is the effective government of a state." *Zivotofsky*, 576 U.S. at 11 (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 203 cmt. a (Am. L. Inst. 1986)); *see also* RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 203 cmt. a (stating that recognition "implies a commitment to treat that regime as the government of that state"). As the Supreme Court has explained, "[l]egal consequences follow formal recognition." *Zivotofsky*, 576 U.S. at 11. Thus, where, as here, the U.S. President has officially recognized the National Assembly as the sole government of Venezuela, that determination "is conclusive on all domestic courts, which are bound to accept [it]." *Guaranty Trust*, 304 U.S. at 138; *see also, e.g.*, *Republic of China v. Pang-Tsu Mow*, 101 F. Supp. 646, 648 (D.D.C. 1951) ("The recognition by the political department of the United States government of a foreign government is conclusive of its legal status as far as the United States Court[s] are concerned.") (*citing Oetjen v. Cent. Leather Co.*, 246 U.S. 297 (1918)), *aff'd*, 201 F.2d 195 (D.C. Cir. 1952). That means that only representatives of National Assembly have standing to appear and speak on behalf of the Republic in U.S. courts. *Rusoro*, 2019 U.S. App. LEXIS 17543, at *1-2; *accord Lukoil*, 65 F.4th at 562-63; *Jiménez*, 250 A.3d at 830-31.

Formal recognition also precludes other co-equal branches of government from issuing any decrees that expressly or implicitly contradict the Executive's recognition of a foreign government. *Zivotofsky*, 576 U.S. at 29-30 (holding that Congress could not direct the U.S. State Department to recognize Jerusalem as part of the State of Israel in contravention of the Executive's recognition policy); *The Maret*, 145 F.2d at 442 (holding that a U.S. court cannot give effect to the acts of an unrecognized government as if they were the acts of the foreign state because that would violate the Executive's recognition policy).

The confirmation process under the New York Convention requires this Court to both recognize and enforce the arbitral award. While recognition and enforcement can occur in the same proceeding before the same court, they are two distinct legal concepts. *Molecular Dynamics, Ltd. v. Spectrum Dynamics Med. Ltd.*, 143 F.4th 70, 82 n.8 (2d Cir. 2025) (citing *Corporación AIC, S.A. v. Hidroeléctrica Santa Rita S.A.*, 66 F.4th 876, 882 n.2 (11th Cir. 2023)). "The recognition of an award is different from its enforcement, therefore, it is possible to recognize and not enforce an award, but impossible to enforce it without previous recognition." *CIMSA*, 58 F.4th at 454.

"'Recognition' is the determination by a court that an arbitral award is binding and entitled to preclusive effect; 'enforcement' is the reduction to a judgment of a foreign arbitral award." *Molecular Dynamics*, 143 F.4th at 82 n.8

31

(citing RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL ARBITRATION § 1.1(nn), (m)); *see also* Yuliya Zeynalova, *The Law on Recognition and Enforcement of Foreign Judgments: Is It Broken and How Do We Fix It?*, 31 BERKELEY J. INT'L L. 150, 155 (2013) ("To 'recognize' a foreign judgment is in essence to domesticate it, thus making it equal to any other judgment produced by a U.S. court, as well as to judgments of other state courts that benefit from the Full Faith & Credit Clause.").

In proceedings applying the public policy exception in the context of a foreign judgment annulling an arbitral award, the Tenth Circuit noted that "'[r]ecognition' and 'enforcement' align with our holding that the district court could consider (1) whether the [] order itself was contrary to public policy—whether it should be recognized—and (2) whether giving effect to the [order] would violate public policy—whether it should be enforced." *CIMSA*, 58 F.4th at 454. Therefore, unlike under the ICSID Convention and its U.S. implementing statute, which treat ICSID awards as if they were already U.S. judgments entitled to full faith and credit, a foreign arbitral award under the New York Convention arrives before the federal court as a foreign decree without any preclusive or legal effect of its own. Rather, it is the U.S. court, through recognition and enforcement, that grants the award the legal and preclusive effect of a U.S. judgment. *See* 9 U.S.C. § 13 (providing that an award confirmed as a judgment "shall have the

same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action"). In essence, by recognizing and enforcing this award, this Court would be giving legal and preclusive effect to the arbitral tribunal's view that the Maduro regime can speak for and bind the Republic under U.S. law, violating the Executive's sole power to recognize the effective government of a foreign state.

The district court erred in finding that, even if the recognition power qualified as a relevant public policy, enforcement of the award would not violate that policy. JA108. While the court correctly noted that, given the "distinction between the [ICSID Convention and New York Convention]," this Court's holding in *Valores* "may not strictly decide this case," it nevertheless relied upon portions of the *Valores* decision to conclude that the enforcement of the award would not violate the recognition power. JA109-13. The district court misunderstood the significance of the differences between the ICSID Convention and the New York Convention and the role U.S. courts plays under each of those treaties.

As acknowledged by this Court in *Valores*, the ICSID implementing statute provides that, in the enforcement process, an ICSID award must "be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States." *Valores*, 87 F.4th at 513 (citing 22 U.S.C. § 1650a(a)). And the FAA does not apply. 22 U.S.C. § 1650a(a). This

means that an ICSID award is treated as if it were already part of the U.S. legal system when it arrives for enforcement to a U.S. court. *Valores*, 87 F.4th at 521-23. That is not the case here.

Ordinarily, a domestic award, meaning an award without any international dimensions, would be subject to a panoply of grounds for vacating it under the FAA. *See* 9 U.S.C. § 10. In that scenario, a U.S. court would be sitting with "primary jurisdiction" over the arbitral proceedings, *Molecular Dynamics*, 143 F.4th at 83, and would also have authority to vacate awards if they are contrary to U.S. public policy. *See Metro. Mun. of Lima v. Rutas de Lima S.A.C.*, 141 F.4th 209, 219 (D.C. Cir. 2025) ("[W]e note that we have previously recognized non-statutory grounds for vacating an arbitration award under the FAA, where the award 'is in manifest disregard of the law or is contrary to an explicit public policy.'"); *Schwartz v. Merrill Lynch & Co.*, 665 F.3d 444, 452 (2d Cir. 2011) (explaining that courts should only set aside awards on public policy grounds under the FAA when the public policy is "well defined and dominant"). That is also true with respect to international arbitrations seated in the United States or governed by U.S. arbitration law. *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, 126 F.3d 15, 18-23 (2d Cir. 1997); *see, e.g.*, *State of Libya v. Strabag SE*, No. 21-7128, 2022 U.S. App. LEXIS 14796, at *3-4 (D.C. Cir. May 27, 2022); New York Convention, art. V(1)(e). Even if a party fails to move to vacate a U.S.-

seated international award within time period required under the FAA, a party is still able to oppose confirmation under the New York Convention on public policy grounds. *See Commodities & Minerals Enter. v. CVG Ferrominera Orinoco, C.A.*, 111 F.4th 1294, 1299 (11th Cir. 2024). Accordingly, a U.S. court would be able to supervise and correct any improper attempt by representatives of the unrecognized, illegitimate Maduro regime from intervening and purporting to act on behalf of the Republic in those arbitral proceedings.

Conversely, when a U.S. court is faced with a foreign award, as is the case here, it is sitting with "secondary jurisdiction." *Molecular Dynamics*, 143 F.4th at 83-4. In this situation, a court is limited to the enumerated exceptions for refusing to recognize and enforce an award under Article V of the New York Convention, *Id.* at 84, and the public policy exception stands as a final safeguard for U.S. courts to protect the U.S. legal system from the domestication of foreign awards that are irreconcilable with this nation's basic legal norms and constitutional structures. *See* WOLFF, NEW YORK CONVENTION at 403.[13]

---

[13] The district court suggested that enforcement of the award would not violate the Executive's recognition of the National Assembly because the award is an "act or decree of *the third-party arbitrator*, not the Maduro regime." JA112. That is a distinction without a difference. It is the arbitrator's decision (and VUS' willingness) to allow the Maduro regime to step in purportedly for the Republic to the exclusion of the U.S.-recognized government that created the problem for seeking to enforce the award in the United States. *See The Maret*, 145 F.2d at 442 (declining to credit the instructions of the owner of The Maret as valid because

The district court also erred in accepting VUS' argument that the award can be enforced against the Republic in the United States because "the *party* to the Arbitration" was the Venezuelan state, not any particular government, and "thus the one bound by the Final Award, 'was the Bolivarian Republic of Venezuela—the nation state—and not one government or the other.'" JA110. The district court incorrectly relied on the principle that "the legal position of a foreign state survives changes in its governments," and "the obligations of a foreign state are unimpaired by a change in the state's government." JA110-11 (quoting *Republic of Iraq v. ABB AG*, 768 F.3d 145, 163-64 (2d Cir. 2014)). That principle does not apply here, because this is not a case of succession of governments. The Maduro regime was no longer the effective government of Venezuela, as recognized by the United States, when it purported to change the Republic's representation in the final damages phase of the arbitration. Therefore, its acts cannot bind the Venezuelan state as a matter of U.S. law. *Zivotofsky*, 576 U.S. at 11-15; *see also Lukoil*, 65 F.4th at 562-63. To hold otherwise would fly directly in the face of the Executive's recognition of the National Assembly as the only government of Venezuela with authority to speak for and bind the Venezuelan state.

_____

doing so would amount to recognizing the ownership claim of the unrecognized Soviet government of Estonia). A public policy violation cannot be washed by the decision of the arbitrators, otherwise there could never be a violation of a public policy.

Finally, recognition and enforcement of an award carries with it significant benefits; namely, it provides "the winning party a variety of remedies for enforcement" of the resulting judgment. *Stafford v. IBM*, 78 F.4th 62, 68 (2d Cir. 2023) (citing *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984)). Thus, enforcing the award by entering a judgment of this Court against the Republic would enable VUS to use all available judicial mechanisms to enforce that judgment against the Republic's assets in the United States. *See LLC SPC Stileks v. Republic of Moldova*, 985 F.3d 871, 875 (D.C. Cir. 2021) ("Once Energoalliance had a judgment in hand, it could go about enforcing the arbitration award by, for example, attaching Moldova's commercial assets in the United States.").

This is not a hypothetical concern. VUS never denied that its original intention in bringing this foreign award to the United States was to seek an attachment of assets belonging to Venezuela's national oil company, PDVSA, in Delaware on the theory that PDVSA is the Republic's alter ego, in an effort to join the ongoing process to sell those assets. *See*, *e.g.*, *OI European Grp. B.V. v. Bolivarian Republic of Venezuela*, 73 F.4th 157, 176 (3d Cir. 2023); *Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela*, 932 F.3d 126, 152 (3d Cir. 2019). While VUS is now foreclosed from joining that sale process, confirmation of the award as a U.S. judgment would still permit VUS to utilize the U.S. judicial system to seek to attach other U.S. property of the Republic.

Whatever assets of the Republic VUS may be able to target, there can be no dispute that the unrecognized, illegitimate Maduro regime has no cognizable interest in those assets. *See, e.g.*, *Jiménez*, 250 A.3d at 830-32; *see also In re Terrorist Attacks on September 11, 2001*, 657 F. Supp. 3d 311, 320, 333-36 (S.D.N.Y. 2023) (recognition doctrine precluded judgment creditors' motion for turnover of assets held in the name of Afghanistan's central bank because their judgments were against the Taliban, and U.S. court was "constitutionally restrained from determining the Taliban is the legitimate government of Afghanistan as required to attach [the central bank's] assets"), *aff'd on other grounds*, 152 F.4th 339 (2d Cir. 2025); *Republic of Panama v. Rep. Nat. Bank of N.Y.*, 681 F. Supp. 1066, 1071 (S.D.N.Y. 1988) (quoting *Bank of China v. Wells Fargo Bank & Union Trust Co.*, 104 F. Supp. 59, 66 (N.D. Cal. 1952)) (rejecting attempt by an unrecognized regime to assert ownership of funds in Panama's U.S. bank account).

Only the U.S.-recognized government can exercise any ownership rights in the Republic's property in the United States. *See Lukoil*, 65 F.4th at 562-63; *Jiménez*, 250 A.3d at 830-31. Yet, the U.S.-recognized government had no role in the defense of the Republic in the damages phase of the proceedings that resulted in the award. To enforce the award would allow VUS to do indirectly what it could not do directly: use the U.S. judicial system to execute upon the Republic's assets in the United States by obtaining a judgment rendered in proceedings in which the

only U.S.-recognized government of Venezuela was excluded from defending the Republic—actions that undoubtedly contravene the Executive's recognition of the National Assembly and the underlying policy of preserving the Republic's assets for the benefit of the Venezuelan people and a transition to democracy.

Permitting VUS to obtain a judgment on an arbitral award that was issued against the illegitimate Maduro regime so it can then proceed against assets of the Republic in which the Maduro regime has no legal right would only serve to weaken the Executive's recognition of the National Assembly. It would be fundamentally unjust if claimants around the world could obtain arbitral awards by dealing exclusively with the Maduro regime in contravention of the Executive's recognition of the National Assembly (and express derecognition of the Maduro regime), and then, rather than execute on assets in jurisdictions that recognize the Maduro regime, attempt to enforce that award against the only U.S.-recognized government of Venezuela and attach its assets with the assistance of U.S. courts. Indeed, as recognized by the district court, there are countries that recognize the Maduro regime where VUS could have sought confirmation of their award. JA103. Despite having alternative forums to choose from, VUS sought confirmation in the United States. VUS wants American courts and laws to enforce its award, but disregarded U.S. public policy in obtaining that award.

By enforcing awards issued against the Maduro regime, this Court would be giving license to other claimants to litigate in foreign proceedings with the Maduro regime to the exclusion of the U.S.-recognized government and then bring those awards to weaken the position of the U.S.-recognized government. It is not difficult to see how bad actors might utilize this process in an effort to weaken the U.S.-recognized government and the Executive's foreign policy objectives in using its recognition power.

In brief, this case presents precisely the sort of circumstances that should prevent a U.S. court from enforcing and recognizing a foreign arbitral award on public policy grounds under the New York Convention.

## CONCLUSION

For these reasons, the district court's decision should be reversed.

Dated: November 25, 2025

Respectfully submitted,

CURTIS, MALLET-PREVOST,
   COLT & MOSLE LLP

By: ___/s/ Joseph D. Pizzurro_____
Joseph D. Pizzurro (D.C. Bar No. 468922)
Juan O. Perla (D.C. Bar No. 1660389)
1717 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Tel.:   (202) 452-7373
Fax:   (202) 452-7333
Email:  jpizzurro@curtis.com
Email:  jperla@curtis.com

- and -

David V. Holmes
101 Park Avenue
New York, NY 10178
Tel.:   (212) 696-6000
Fax:   (212) 697-1559
Email:  dholmes@curtis.com

*Attorneys for Defendant-Appellant*
*Bolivarian Republic of Venezuela*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(g), I hereby certify that the foregoing brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7) because it contains 9,676 words, excluding the parts of the document exempted by Fed. R. App. P. 32(f).

The foregoing document also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in 14-point Times New Roman proportionally spaced font using Microsoft Word.

  */s/ Joseph D. Pizzurro*
Joseph D. Pizzurro
(D.C. Bar No. 468922)

**CERTIFICATE OF SERVICE**

I hereby certify that on the 25th day of November, 2025, I caused a copy of the foregoing document to be filed with the Clerk of the Court of the U.S. Court of Appeals for the District of Columbia Circuit via the Court's Electronic Filing System, and to be served electronically upon all counsel of record through that system.

 */s/ Joseph D. Pizzurro*
Joseph D. Pizzurro
(D.C. Bar No. 468922)

# ADDENDUM

# PERTINENT STATUTES AND OTHER PROVISIONS

## Constitutional Provisions

U.S. Const., art. II, § 2, Cl 2. Treaties—Appointment of officers............... ADD1

U.S. Const., art. II, § 3 - Recommendations to Congress—
Convene and adjourn Congress—Receive ambassadors—
Execute laws—Commission officers........................................................... ADD1

## New York Convention

Article V ................................................................................................ ADD2

## ICSID Convention Implementing Statute

22 U.S.C. § 1650a ................................................................................. ADD3

## ICSID Convention

Article 53 ............................................................................................... ADD3

Article 54 ............................................................................................... ADD3

**Constitutional Provisions**

U.S. Const., art. II, § 2

Cl 2. Treaties—Appointment of officers

He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur; and he shall nominate, and by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls, Judges of the supreme Court, and all other Officers of the United States, whose Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone, in the Courts of Law, or in the Heads of Departments.

U.S. Const., art. II, § 3 - Recommendations to Congress—Convene and adjourn Congress—Receive ambassadors—Execute laws—Commission officers

He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures as he shall judge necessary and expedient; he may, on extraordinary Occasions, convene both Houses, or either of them, and in Case of Disagreement between them, with Respect to the Time of Adjournment, he may adjourn them to such Time as he shall think proper; he shall receive Ambassadors and other public Ministers; he shall take Care that the Laws be faithfully executed, and shall Commission all the Officers of the United States.

**New York Convention**

Article V

1.      Recognition and enforcement of the award may be refused, at the request of the party against whom it is invoked, only if that party furnishes to the competent authority where the recognition and enforcement is sought, proof that:

(a)      The parties to the agreement referred to in article II were, under the law applicable to them, under some incapacity, or the said agreement is not valid under the law to which the parties have subjected it or, failing any indication thereon, under the law of the country where the award was made; or

(b)      The party against whom the award is invoked was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise unable to present his case; or

(c)      The award deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration, provided that, if the decisions on matters submitted to arbitration can be separated from those not so submitted, that part of the award which contains decisions on matters submitted to arbitration may be recognized and enforced; or

(d)      The composition of the arbitral authority or the arbitral procedure was not in accordance with the agreement of the parties, or, failing such agreement, was not in accordance with the law of the country where the arbitration took place; or

(e)      The award has not yet become binding on the parties, or has been set aside or suspended by a competent authority of the country in which, or under the law of which, that award was made.

2.      Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that:

(a)      The subject matter of the difference is not capable of settlement by arbitration under the law of that country; or

(b)     The recognition or enforcement of the award would be contrary to the public policy of that country.

## ICSID Convention Implementing Statute

22 U.S. Code § 1650a - Arbitration awards under the Convention

(a)     Treaty rights; enforcement; full faith and credit; nonapplication of Federal Arbitration Act. An award of an arbitral tribunal rendered pursuant to chapter IV of the convention shall create a right arising under a treaty of the United States. The pecuniary obligations imposed by such an award shall be enforced and shall be given the same full faith and credit as if the award were a final judgment of a court of general jurisdiction of one of the several States. The Federal Arbitration Act (9 U. S. C. 1 *et seq.*) shall not apply to enforcement of awards rendered pursuant to the convention.

(b)     Jurisdiction; amount in controversy. The district courts of the United States (including the courts enumerated in title 28, United States Code, section 460 [28 USCS § 460]) shall have exclusive jurisdiction over actions and proceedings under paragraph (a) of this section, regardless of the amount in controversy.

## ICSID Convention

Article 53

(1)     The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention. Each party shall abide by and comply with the terms of the award except to the extent that enforcement shall have been stayed pursuant to the relevant provisions of this Convention.

(2)     For the purposes of this Section, "award" shall include any decision interpreting, revising or annulling such award pursuant to Articles 50, 51 or 52.

Article 54

(1)     Each Contracting State shall recognize an award rendered pursuant to this Convention as binding and enforce the pecuniary obligations imposed by that award within its territories as if it were a final judgment of a court in that State. A

Contracting State with a federal constitution may enforce such an award in or through its federal courts and may provide that such courts shall treat the award as if it were a final judgment of the courts of a constituent state.

(2)    A party seeking recognition or enforcement in the territories of a Contracting State shall furnish to a competent court or other authority which such State shall have designated for this purpose a copy of the award certified by the Secretary-General. Each Contracting State shall notify the Secretary-General of the designation of the competent court or other authority for this purpose and of any subsequent change in such designation.

(3)    Execution of the award shall be governed by the laws concerning the execution of judgments in force in the State in whose territories such execution is sought.